**Kenneth L. GASTON, Plaintiff,**

**v.**

**Thomas A. COUGHLIN, III, Commissioner, Department of Correctional Services; William Costello, Deputy Superintendent of Security Services, Eastern Correctional Facility; Silas Countryman, Sergeant; John B. Calhoun, Correction Officer; Jeffrey A. Marcus, Correction Officer; Sherman Richards, Correction Counselor; Robert Hoke, Superintendent, Eastern Correctional Facility; and Robert J. Fleming, Deputy Superintendent for Programs, Eastern Correctional Facility, Defendants.**

**No. 90–CV–820(LEK/RWS).**

United States District Court, N.D. New York.

Nov. 3, 1999.

---

Kenneth L. Gaston, Collins, NY, plaintiff pro se.

Office of Salvatore J. Piemonte, Syracuse, NY, for plaintiff, Salvatore J. Piemonte, of counsel.

Eliot L. Spitzer, Attorney General of the State of New York Litigation Bureau, Albany, NY, for the defendants, Jeffrey P. Mans, of counsel.

## MEMORANDUM–DECISION AND ORDER

KAHN, District Judge.

Plaintiff Kenneth L. Gaston, an inmate in the custody of the New York State Department of Correctional Services, brings this action because he alleges that in 1988 Defendants John B. Calhoun and Jeffrey A. Marcus, who are Correction Officers employed by the State, imposed disciplinary sanctions on him in retaliation for Constitutionally protected activities. Specifically, the Plaintiff, who then worked (principally as a cook) in the mess hall of Eastern Correctional Facility, in Napanoch, says that he brought to the attention of prison authorities a provision in State law governing the conditions of inmate labor, told the authorities that the work schedules they required of the inmates violated that law, and asked the authorities to reduce inmate work schedules accordingly. The Plaintiff was soon afterwards restricted from mess hall work, and transferred to another correctional facility. He claims that prison authorities imposed these sanctions in retaliation for his raising the issue of inmate work schedules; the Defendants assert that, to the contrary, sanctions were imposed because the Plaintiff committed disciplinary infractions. Plaintiff states that the sanctions harmed him by depriving him of a favored work assignment, by depriving him of wages, by forcing him to delay and alter his educational plans and incur additional educational costs, and by placing adverse reports (including a Program and Security Assessment Summary ("PSAS")) in his Department of Correctional Services inmate file—reports to the effect that he was a security risk and an inappropriate influence on the inmate population.

Plaintiff, in his third amended complaint, asserted claims under 42 U.S.C. §§ 1983, 1985(3) and 1986 for deprivation under color of State law of rights secured by the Constitution of the United States, alleging three causes of action: (1) conspiracy, (2) retaliation in violation of the First and Fourteenth Amendments, and (3) violation of due process. Previously, this Court, the late Judge Con. G. Cholakis presiding, granted summary judgment (26 July 1993, Doc. 83) to five Defendants, excluding Sergeant Silas Countryman ("Countryman"), Correction Officer John B. Calhoun ("Calhoun") and Correction Officer Jeffrey A. Marcus ("Marcus"), who were not part of that unopposed summary judgment motion (15 Jan. 1993, Doc. 73).

Those remaining Defendants subsequently moved for summary judgment (10 Apr. 1998, Doc. 101), which this Court granted in part and denied in part. (Memorandum–Decision and Order at 13–14 (8 Oct. 1998, Doc. 134).) The action against Countryman was dismissed in its entirety; against Calhoun and Marcus, the retaliation claim alone survived. (*Id.*) This Court also denied the Defendants' motion for summary judgment on the ground of qualified immunity. (*Id.*) Accordingly, Plaintiff brings this action under 42 U.S.C. § 1983 [1] alleging that the Defendants violated his rights under the First and Fourteenth

---

**1.** In pertinent part:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ..., subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress....

Amendments [2] by filing false reports about him in retaliation for his complaints about work conditions. The Court's Order of 8 July 1998 (Doc. 115) granted the Plaintiff's request for a bench trial, to which the Defendants subsequently consented and stipulated (6 Oct. 1998, Doc. 129). Trial was held before the Court on 15 October 1998 at the United States District Courthouse in Syracuse, New York.

For relief, Plaintiff seeks a declaratory judgment that the Defendants' acts have violated Plaintiff's Constitutional rights, a permanent injunction against further retaliation against Plaintiff or against other inmates who have submitted affidavits on behalf of Plaintiff, compensatory damages in the amount of $5,000.00 against each of the Defendants and punitive damages in the amount of $15,000 against each of the Defendants, back pay for lost wages, Plaintiff's costs for this action, and such other and further relief as the Court deems just, proper and equitable.

## I. Background

Plaintiff is an inmate in the custody of the New York State Department of Correctional Services. In 1988 he was a worker in the mess hall at Eastern Correctional Facility. On 22 or 23 February 1988 he discussed with Correction Officer James P. Dennin [3] the issue of whether the inmate workers in the mess hall should have a day off, and be required to work no more than eight hours a day, in conformity with N.Y.Correct.Law § 171.[4] Subsequently, Plaintiff met with inmate Xavier Jackson,

the President of the Inmate Liaison Committee ("ILC"), and proposed that the ILC present the prison administration with a complaint at the next Executive Committee Meeting, alleging that they were in violation of this State law. Plaintiff then filed an ILC administrative complaint on the basis of Section 171.

On or about 26 or 27 February 1988, Plaintiff met with Robert J. Fleming, Deputy Superintendent for Programs at the prison, inmate John Green (who had initially informed Plaintiff of the substance of Section 171) and two other Correction Officers (neither of whom has been a Defendant in this case). He discussed certain work conditions, and his opinion that the mess hall schedule was not in compliance with Section 171 because that schedule did not limit inmates to eight hours' work per day and give them a day off each week, but instead required them to work twelve to sixteen hours a day, seven days a week. Fleming, according to Plaintiff's testimony, responded that he could not give mess hall workers a day off because he was understaffed. In the Plaintiff's view, Fleming appeared at first not to understand that reducing the work schedules was *mandatory* under state law, and instead treated Plaintiff's petition as a generic request for easier conditions that he could not accommodate. Plaintiff persisted, showing Fleming the text of Section 171. Fleming, seeing that the limits on work schedules were required by law, said that he would have to look into the matter further. (Tri-

---

**2.** Amendment I (in pertinent part):
  Congress shall make no law ... abridging the freedom of speech, ... or the right of the people peaceably ... to petition the government for a redress of grievances.
  Amendment XIV (in pertinent part):
  Section 1. .... No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state ... deny to any person within its jurisdiction the equal protection of the laws.

**3.** C.O. Dennin's name is misspelled "Denny" in the trial transcript (Doc. 138), and "Deni"

in both Plaintiff's Third Amended Complaint and the Court's 8 October 1998 Memorandum–Decision and Order.

**4.** N.Y.Correct.Law § 171 (McKinney 1993) states, in pertinent part, that employment of inmates in State correctional facilities is "not to exceed eight hours of each day other than Sundays and public holidays" unless an inmate *volunteers* to work on a Sunday or a public holiday in "specialized areas" of the facility, in which case the inmate "so employed shall be allowed an alternative free day within the normal work week." § 171(1).

al Tr. at 20 lines 5–18 (Doc. 138); *see also* Pl.'s Third Am.Compl. at 4 (11 May 1992, Doc. 49).)

Four or five days later, on 2 March 1988, Countryman, who was kitchen sergeant, informed Plaintiff that he was being restricted from working in the kitchen. The reasons for this restriction are in dispute. The Plaintiff testified that Countryman did not answer his specific questions as to what misconduct he was being restricted for, and who had accused him of misconduct. Nor, he said, did any other Correction official inform him at that time why he was being disciplined. He further testified that no misbehavior report was filed against him. (*Id.* at 25 line 5 to 26 line 4, 26 line 18 to 27 line 3.) Two days after he was restricted from working in the kitchen, Plaintiff filed a grievance in which he asked who ordered the action and what the basis for the action was. As a result, he was informed that William Costello, Deputy Superintendent of Security Services, ordered the removal.

Notwithstanding Countryman's apparent failure to give Plaintiff full details of the reasons for the sanctions against him, on 2 March 1988 he wrote a memo to Costello. (Pl.'s ex. 8.) He said that he had received a memo from Calhoun and Marcus referring to information from a confidential source, to the effect that Plaintiff was "an instigator in trying to organize a work stoppage in the Kitchen complex." Accordingly, he had informed Plaintiff that he was restricting him indefinitely from working in the kitchen complex.

While Countryman's memo indicated (perhaps by virtue of a typographical error) that he had received a single memo jointly authored by Calhoun and Marcus, no jointly authored memo was entered into evidence. Instead, the parties submitted copies of memos written individually by Defendants. In his memo, Marcus alleged that on 26 February 1988 he was conducting the noon meal in the mess hall when he overheard a group of inmates discussing a new kitchen work rule. (*See also* Def.

7.1(f) Statement ¶ 1 (10 Apr. 1998, Doc. 102).) Marcus noted that the discussion was very "heated," that it continued at the instigation of Plaintiff and stopped every time Marcus came close to the inmates. (*Id.* ¶ 3.) However, he alleged he did overhear Plaintiff state: "We're just working here because we *want* to work here. If we all decided *not* to work, what would they do *then*?! . . . . [W]hen we decide not to work, then *they'll* have the problem, not us!" (*See also* Marcus Aff. ¶ 8, Ex. A (10 Apr. 1998, Doc. 103).) He further alleged that the next day, 27 February 1988, there was a sit-down work stoppage in two of the facility mess halls.

Calhoun alleged in his memo that on that very day (2 March 1988), he had overheard Plaintiff state to another inmate that "if they all walked out he would propably [*sic*] stay behind." (Defs.' Ex. 2; *see also* Calhoun Aff. ¶ 6 (10 Apr. 1998, Doc. 103).) He said he felt this was significant because once before he had heard a couple of inmates say that Plaintiff was talking about a slowdown in the kitchen.

Neither memo mentions information from a confidential source, as referred to in Countryman's memo.

Plaintiff maintains that the information in both memos is false. He also asserted in his testimony and in an affidavit that there was no work stoppage on 27 February 1988. (*See* Trial Tr. at 21 line 20 to 22 line 4; Gaston Aff. ¶ 7 (15 May 1998, Doc. 109).) His complaint, too, asserts that there was no work stoppage that day, although it notes that, as Plaintiff testified at trial, one inmate working in the mess hall, Mr. Green, walked out of the mess hall complex that day in protest of unresolved working conditions, following the meeting he and the Plaintiff had with the Correction officials. (*See* Pl.'s Third Am.Compl. ¶¶ 35–40; Trial Tr. at 22 line 5 to 25 line 4; *supra* page 384.)

On 30 March 1988, Correction Counselor Sherman Richards prepared a PSAS requesting that Plaintiff be transferred.

Richards noted that Plaintiff was "a security risk to the facility since he has been trying to instigate a work stoppage in our kitchen complex." (Countryman Aff. Ex. D (10 Apr. 1998, Doc. 103); Defs.' Rule 10(J) Statement ¶ 19 (15 Jan. 1993, Doc. 73).) Plaintiff was transferred out of Eastern Correctional Facility on 8 May 1988, to Auburn Correctional Facility. This seriously disrupted his studies for a Master of Arts degree in sociology at the State University of New York at New Paltz. (*See* Trial Tr. at 38 line 6 to 41 line 2; Pl.'s Third Am.Comp. at 8, ¶¶ 46–47 (Doc. 49).)

## II.  *Discussion*

### A.  *Standard of Review*

■  To establish a retaliation claim under § 1983, Plaintiff must show that his conduct was protected by the First Amendment and that Defendants retaliated against him for engaging in the protected conduct. *See Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir.1996); *Gagliardi v. Village of Pawling*, 18 F.3d 188, 193 (2d Cir.1994). The Plaintiff must prove his allegations by a fair preponderance of the credible evidence. If he meets this burden, the Defendants may prevail by showing by a fair preponderance of the credible evidence that they nonetheless had sufficient proper reasons for filing the adverse memos against Plaintiff. *See Graham*, 89 F.3d at 79.

### B.  *Plaintiff's Case*

■  The right to complain to public officials and to seek administrative relief is protected by the First Amendment. *Gagliardi*, 18 F.3d at 193. Thus, Plaintiff's attempts to obtain redress of a perceived violation of State law are protected conduct. Further, it is established that the filing of false accusations, when done in retaliation for protected conduct, is actionable under § 1983. *See Taylor v. Sullivan*, 980 F.Supp. 697, 704 (S.D.N.Y.1997) (citing *Franco v. Kelly*, 854 F.2d 584, 585

(2d Cir.1988)). Plaintiff thus states a claim upon which relief can be granted.

In addition, the Court notes that New York law specifically protects the right of inmates to petition authorities for redress of grievances within the Correction system.

Inmates shall not be disciplined for making written or oral statements, demands, or requests involving a change of institutional conditions, policies, rules, regulations, or laws affecting an institution.

N.Y.Correct.Law § 138(4) (McKinney 1993). Plaintiff apparently did not ask this Court to exercise pendent jurisdiction over any State law claim based on this provision. He did, however, cite this law in Plaintiff's Proposed Findings of Fact and Conclusions of Law at 12 (13 Oct. 1998, Doc. 132), and Plaintiff's Trial Memorandum of Law at 4 (13 Oct. 1998, Doc. 133).

■  Plaintiff does not allege any evidence that directly suggests a retaliatory animus in Marcus or Calhoun, nor does he allege any evidence that directly demonstrates that Marcus or Calhoun were aware of his protected conduct. The Plaintiff does deny the conduct alleged in the memos by Marcus and Calhoun, and it is not disputed that he raised the issue of the Section 171 restrictions on work schedules with various prison officials, and thus engaged in protected conduct. Plaintiff did not attempt to hide these activities. Within a week of Plaintiff's protected conduct, Marcus and Calhoun filed memos reporting against Plaintiff. The closeness in time between the two events and the fact that Plaintiff informed at least four prison officials of his objections, including three Correction Officers and Fleming, the Deputy Superintendent, is sufficient to allow a reasonable trier-of-fact to infer that Marcus and Calhoun learned of Plaintiff's objections to prison policy and retaliated against him for it. *See Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir.1995) (holding that "temporal proximity" between an inmate's protected conduct and the adverse action

may serve as "circumstantial evidence of retaliation").

The Court further found that Plaintiff's demeanor while testifying at trial, under direct and cross examination, was forthright. He demonstrated by a fair preponderance of the credible evidence that he had engaged in Constitutionally protected activity, that for that activity he had been the target of retaliation by the Defendants, and that he had not engaged in the misconduct that the Defendants had accused him of.

### C. Defendants' Response

The Plaintiff having sustained his burden of proving by a fair preponderance of the credible evidence that the Defendants retaliated against him for his exercise of protected activities, the crux of this case becomes the credibility of the memos by Marcus and Calhoun, which constitute the primary accusations of misconduct against Plaintiff, and were the foundation for the disciplinary measures imposed on the Plaintiff.

Marcus's memo asserts that on 27 February 1988—the day after he overheard Gaston in a "heated" discussion with other inmates in which, Marcus implies, Gaston was inciting the others to misconduct— "there was a sit-down work stoppage in Mess Halls # 1 and # 2, at approximately 7:45 AM, five (5) minutes before the meal was to run." (Pl.'s Ex. 7.) The evidence, however, strongly suggests that no such event occurred. The kitchen logbook is kept by the Correction Officers in order to—among other reasons—provide a means for recording problems and incidents that might be significant enough to require a review at a later time. The kitchen logbook, as Marcus admitted (Trial Tr. at 94 lines 13–16), has no record of any work stoppage on that day. (Def.Ex. 6 at 285.)

A work stoppage is clearly the type of event that is meant to be recorded in the logbook. The 11:10 a.m. entry for 27 February 1988 reads as follows: "[I]nmates this a.m. at approx. 8:30 AM were thinking of not scouring items used on serving line. Discussion with Lt Kinney & inmates involved & inmates agreed to return to work." (Id.; Trial Tr. at 83 lines 1–12.) If Correction Officers entered an account of inmates *thinking* about not doing *part* of their work, then one must conclude that Officers would be much more likely to have entered an account of an *actual* sitdown strike of the sort described in Marcus's memo. The absence of any entry remotely corresponding to the event alleged in the memo corroborates the Plaintiff's assertion that no such work stoppage occurred. Moreover, Sergeant Tony Giammichele, who was on duty in the mess hall 27 February 1988, and who made the 11:10 a.m. logbook entry quoted above, testified that he knew of no work stoppage that occurred that day. (Trial Tr. at 112 lines 18–19.) Accordingly, the Court cannot conclude that Defendants have shown by a fair preponderance of the credible evidence that Marcus had sufficient proper reason for accusing the Plaintiff of misconduct.

The Defendants also adduce as evidence that Plaintiff was "attempting to instigate a work stoppage," or a slowdown (Defs.' Trial Mem. of Law at 9), Defendant Calhoun's undated memo [5] to Sgt. Countryman (Ex. D–2). "I heard Inmate Gaston tell Inmate Sellers that if they all walked out he would propably [sic] stay behind. The reason I feel this is significant is because once before I heard a couple of inmates say Inmate Gaston was talking about a slow down in the kitchen." The most plausible initial interpretation of the Plaintiff's purported 2 March remark, however, is that he would probably *not* participate in a walkout. Accordingly, an

---

5. Apparently written on 2 March 1988; Sergeant Countryman sanctioned the Plaintiff on that day on the basis of Calhoun's memo and Marcus's memo. (Defs.' Proposed Findings of Fact and Conclusions of Law at 2 (5 Oct. 1998, Doc. 125).)

attempt to associate that remark with earlier hearsay, that Gaston was talking about a slowdown, is mere speculation.

Defendant Calhoun had an opportunity at trial to illuminate the meaning of his memo. Instead, he engaged in persistent efforts to be unresponsive on cross-examination; the most reasonable inference the Court can draw from this is that he could not set forth an explanation of his memo that would help his case. Plaintiff's attorney observed that, according to the memo, the Plaintiff said that if the other inmates walked out he would stay behind. Counsel asked Defendant Calhoun what Gaston meant by that. Calhoun replied, "I have no idea what he meant by it."[6] (Trial Tr. at 105 line 3.)

To the contrary, in his very next answer, Calhoun *does* show that he has some idea of what the remark meant: "No, that didn't *mean* he would stay working, just *meant* he would stay behind." (*Id.* lines 6–7 (emphasis added).) Alas, however, after providing that glimmer of hope for clarification, Calhoun immediately reverted to his earlier theme.

> Q  Behind where?
>
> A  I don't know. Mr. Gaston made the statement, not me.

(*Id.* lines 8–10.)

Calhoun further testified that, basically, on 2 March he heard "that something was going on and I wanted the supervisor to be informed."

> Q  Okay. What was going on?
>
> A  Well, what do you mean specifically by what was going on?
>
> Q  What was going on? What did you hear was going to happen?
>
> A  They were talking about walking out.
>
> Q  Okay. Walking out of what?
>
> A  Job, I assume.
>
> . . . .

> Q  And relative to Mr. Gaston's role in this walking out, what did you hear about that?
>
> A  What do you mean, relative? What I heard was exactly what I wrote.
>
> Q  Which is what, that Mr. Gaston probably wouldn't participate?
>
> A  Said, if you walked out, I would stay behind, he didn't say he wouldn't participate.
>
> Q  Isn't that what that means?
>
> A  No, you're putting words in my mouth.
>
> Q  I'm asking you what you think that means.
>
> A  I think it means what it says.
>
> Q  Which is what, sir?
>
> A  I don't know because I don't know what was in Mr. Gaston's mind.

(*Id.* at 106 line 1 – 107 line 2.) Plaintiff's counsel was asking reasonable, *simple* questions, concerning Calhoun's statements in testimony and his memo. Calhoun's replies suggest a level of confusion or ignorance to which the Court simply cannot give credence. "**A:** Something was going on." "**Q:** Okay. What was going on?" "**A:** Well, what do you mean specifically by 'What was going on?'"

Defendant Calhoun's testimony was contradictory, often evasive, and time and again he avoided giving answers to pertinent questions. Defendants have thus failed to show by a preponderance of the evidence that Calhoun had a proper reason for accusing the Plaintiff of misconduct.

### D.  *Defendants' Failure to Conform to "Misbehavior Report" Standards*

There is another difficulty with the 2 March memos and the accusations against Gaston. State Rules and Regulations specify that each incident of inmate mis-

---

**6.**  Defendant Calhoun submitted a sworn affidavit in which he averred that he "observed [P]laintiff engaging in suspicious activity [that] possibly threatened a work stoppage in the facility kitchen complex." (10 Apr. 1998, Doc. 103.) There would seem to be no way that Calhoun could have reached that conclusion about Plaintiff's acts and words, and still "have no idea what [Plaintiff] meant."

conduct that poses a danger to "life, health, security or property" must be reported in writing without delay. This section of the Rules and Regulations covers in great detail who is to make the report, how it is to identify the nature and time of the incident, the rule violated, and the inmate involved; it also mandates precise language to be included in the report, advising the subject inmate of his rights in any hearing connected with the misbehavior report. The text of this section in pertinent part is as follows:

**Section 251–3.1—Misbehavior report.**

(a) Every incident of inmate misbehavior involving danger to life, health, security or property must be reported, in writing, as soon as practicable.

(b) The misbehavior report shall be made by the employee who has observed the incident or who has ascertained the facts of the incident. Where more than one employee has personal knowledge of the facts, each employee shall make a separate report or, where appropriate, each employee shall endorse his/her name on a report made by one of the employees.

(c) The misbehavior report shall include the following:

(1) a written specification of the particulars of the alleged incident of misbehavior involved;

(2) a reference to the inmate rule book number allegedly violated by the inmate, and a brief description of the rule;

(3) the date, time and place of the incident;

(4) when more than one inmate was involved in an incident, the report should, to the extent practicable under the given circumstances, indicate the specific role played by each inmate. Where two or more incidents are involved, all of them may be incorporated into a single misbehavior report. However, each incident must be separately stated.

(d) All misbehavior reports shall also contain the following language:

(1) "You are hereby advised that no statement made by you in response to the charge, or information derived therefrom may be used against you in a criminal proceeding."

(2) "You will be permitted to call witnesses on your behalf provided that doing so does not jeopardize institutional safety or correctional goals."

(3) "If restricted pending a hearing for this misbehavior report, you may write to the Deputy Superintendent of Security or his/her designee prior to the hearing to make a statement on the need for continued prehearing confinement."

N.Y.Comp.Codes R. & Regs. tit. 7, § 251–3.1 (1999).

The Plaintiff testified that he never received a misbehavior report in connection with the sanctions he was subject to (Trial Tr. at 26 line 22 to 27 line 3), Marcus admitted that apparently no misbehavior report was ever prepared in Plaintiff's disciplinary proceedings (*id.* at 92 lines 11–20), and no evidence of the existence of any such misbehavior report was ever submitted to the Court. The memos by Marcus, Calhoun and Countryman do not come close to fulfilling the requirements mandated by the Rules and Regulations, as counsel for Plaintiff made abundantly clear in his cross-examination of Marcus (*id.* at 88 line 20 to 92 line 20). Even Marcus's memo, which was longer and more detailed than Calhoun's, fell well short of the misbehavior report requirements. It was dated five days after the incident it reported; that cannot be construed as "as soon as practicable." It failed to refer to any inmate rule book number that Plaintiff allegedly violated, much less describe the rule. It also failed to incorporate the advisory language prescribed by the Rule and Regulation. Calhoun's memo was apparently written on the day he says he observed the

conversation between Plaintiff and inmate Sellers, but it is even less successful in specifying that the behavior it purports to report was an instance of misconduct.

On the basis of the accusations Calhoun and Marcus made against the Plaintiff, the State Rules and Regulations required that they make misbehavior reports against him. Mess hall strikes such as he was accused of inciting would not be minor incidents, but would pose a danger at least to health and security, two of the criteria the law contemplates. Defendants themselves assert that they believed at that time that Plaintiff's "activism" posed a danger to "the facility's *safety* and *security.*" (Defs.' Proposed Findings of Fact and Conclusions of Law at 4, 8 (5 Oct. 1998, Doc. 125) (emphasis added); *see also* Defs.' Trial Mem. of Law at 9 (5 Oct. 1998, Doc. 128).)

Defendants' counsel's attempts to elicit testimony that the Defendants had observed Plaintiff engaged in conduct that was too minor to warrant a full misbehavior report are unavailing. (Trial Tr. at 96 line 12 to 97 line 5.) The distinctions counsel for Plaintiff made on re-cross—that incidents of misconduct that do not pose a danger to life, health, security or property are the ones Correction officials do *not* write up, but that otherwise the law requires that officials report the infraction in writing (*id.* at 97 line 15 to 98 line 11)—are well taken. Moreover, the efforts by counsel for the Defendants to draw a picture of the atmosphere in the mess hall at that time as tense and volatile, and hence as justifying heightened vigilance by Correction officials for acts or speech inciting misconduct (*id.* at 78 line 10 to 86 line 11), are at cross-purposes with the aforesaid attempt to show that the Defendants did not make out misbehavior reports against the Plaintiff because they did not see his misconduct as rising to the level of a serious danger.

The differences between the law's detailed requirements for a misbehavior report, and the memos the Defendants submitted, were latent with adverse consequences for the Plaintiff. The law insists that a misbehavior report be written without delay. Instead, there was a five-day delay between the incident Marcus alleges and his writing of the memo. The law also requires that a misbehavior report state which rule the inmate is accused of breaking, and the specific role each accused inmate played. This would have provided most salutary discipline for Calhoun's memo, and perhaps his testimony. It would have required Calhoun to commit himself to a position that he was accusing the Plaintiff of committing a discrete wrongdoing, and that he could identify it positively, rather than accusing the Plaintiff by vaguely associating him with comments made about him at some uncertain point in the past.

The requirements of misbehavior reports protect Correction officials, inmates, and the interests of justice. Defendants' failure to abide by those requirements should not undermine the effect of those protections for the Plaintiff.

### E. *Qualified Immunity*

█ The Court holds that the Defendants are not entitled to qualified immunity to liability in this action. The crucial issue is whether the right or rights that Plaintiff claims Defendants violated was clearly established. It cannot be seriously disputed that the First Amendment right to petition government for redress of grievances is clearly established. Moreover, as noted above, New York State law affirms that right for prisoners, and protects them from sanctions imposed for their exercise of that right. The text bears requoting:

Inmates shall not be disciplined for making written or oral statements, demands, or requests involving a change of institutional conditions, policies, rules, regulations, or laws affecting an institution.

N.Y.Correct.Law § 138(4) (McKinney 1993). Correction Officers are expected to

be familiar with such laws governing the Correction system; by virtue of that principle the right protected by Section 138 must be taken as "clearly established."

The Court also refers to the decisions of the Second Circuit, which has held that "a prisoner has a substantive due process right not to be subjected to false misconduct charges as retaliation for his exercise of a [C]onstitutional right such as petitioning the government for redress of his grievances...." *Jones v. Coughlin,* 45 F.3d 677, 679–80 (2d Cir.1995) (per curiam). Qualified immunity may not stand as an insurmountable bar to the vindication of such rights, when the claim to qualified immunity rests on factual assertions that the Court rejects in favor of Plaintiff's denials that he engaged in such conduct, and Plaintiff's assertions that he was instead engaging in protected conduct.

### F. Observations on New York Attorney General's Legal and Evidentiary Arguments

The Attorney General of the State of New York, with the Assistant Attorney General of counsel on this case, submitted the Defendants' Proposed Findings of Fact and Conclusions of Law (Doc. 125) on behalf of the Defendants. Among the proposed findings of fact, number 10 stated, "Plaintiff admits that he had several conversations, along with other inmates, regarding a mandatory day off for inmate mess hall workers pursuant to § 171 of the Correction[ ] Law...." (*Id.* at 3; Defs.' Trial Mem. of Law at 4 (Doc. 128).) The proposed conclusions of law include the assertions, "Defendants' actions were legitimate responses to what they perceived as a threat to the good order of the prison mess hall operations. Plaintiff himself admits he made statements to other inmates regarding their right to refuse to work in the mess hall beyond six days a week." (Defs.' Proposed Findings of Fact and Conclusions of Law at 7–8; Defs.' Trial Mem. of Law at 9.)

It is true that the topic of an inmate's speech could encompass clearly protected matters, and the speech nonetheless warrant sanctions against the inmate, if the inmate spoke to incite others to acts against the safety or good order of prison operations. The submissions of the Attorney General quoted above do not, however, make that distinction. Instead, the Attorney General appears to suggest that the Plaintiff was wrong to have brought up the issue of the State law that prohibits State prisons from working inmates longer than eight hours a day, and more than six days a week.

It is not disputed that the Plaintiff made a concerted effort to address Correction officials about this matter, discussing Section 171 with C.O. Dennin (Trial Tr. at 18 line 23 to 19 line 3); with ILC president Jackson, requesting that the ILC present the issue to facility administrative staff (*id.* at 16 line 12 to 18 line 2); and with Deputy Superintendent Fleming and two other Correction Officers (*id.* at 20 lines 5–18). Not only is raising such an issue protected activity under the United States Constitution, *Hudson v. Palmer,* 468 U.S. 517, 523, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984) ("prisoners have the constitutional right to petition the Government for redress of their grievances"), but, as noted above, New York State law specifically provides for the protection of that right for inmates at all correctional facilities. "Inmates shall not be disciplined for making written or oral statements, demands, or requests involving a change of institutional conditions, policies, rules, regulations, or laws affecting an institution." N.Y.Correct.Law § 138(4) (McKinney 1993). Notably, the law does not require that such statements be addressed to prison officials, although Plaintiff did address officials many, if not most, of the occasions he raised the issue.

Prison inmates are—rightly and necessarily—deprived of or restricted in many liberties that the general population consider their birthright. Nonetheless, though prisoners' Constitutional and legal

rights are qualified, they are not extinguished altogether. *See Wolff v. McDonnell,* 418 U.S. 539, 555–56, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974); *cf. Frazier v. Ward,* 426 F.Supp. 1354, 1365–66 (N.D.N.Y.1977) (Foley, C.J.) (observing that prisoners retain Fourth Amendment protections against unreasonable search and seizure, and a qualified right to privacy). This Court rejects any suggestion that an inmate's contemplation and discussion of his Constitutional and legal rights may be adduced as evidence of a transgression of the necessary discipline and order of a prison.

### G. *Conclusions of Fact*

For the foregoing reasons, the Court as trier of fact finds by a fair preponderance of the credible evidence that Defendants Calhoun and Marcus are liable to Plaintiff Gaston for retaliation against his Constitutionally protected activities.

### III. *Damages and Other Relief*

*Declaratory relief:* It is the verdict and judgment of this Court that the Defendants' acts violated the Plaintiff's Constitutional rights, and rendered the Defendants liable to the Plaintiff pursuant to 42 U.S.C. § 1983.

*Injunctive relief:* The injunctive relief Plaintiff seeks against prospective retaliation is not appropriate at this point, and accordingly is **DENIED.**

The injunctive relief sought with respect to the Plaintiff's prison files and records is hereby **GRANTED.** The Court orders that the memos associated with, and records of, this incident, found in Plaintiff's inmate file or other Correctional Services records, are to be expunged from his records.

*Compensatory relief:*

*Educational costs:* The Court finds, on the basis of Plaintiff's testimony (Trial Tr. at 40 line 19 to 41 line 2), that because of the Defendants' acts of retaliation the Plaintiff incurred extra educational costs of $500.00.

*Other educational harm:* The Plaintiff was delayed in earning his Master's degree, and rather than earning it in sociology, his preferred field, he had to pursue the degree in African American studies and American studies. In some respects it does not appear that these modest adjustments can have been especially onerous for the Plaintiff to bear. A limited delay in earning one's degree, and a degree in a field not terribly far removed from one's original goal, at first blush appear trifling burdens. The value of educational goals, however, is not readily quantifiable by simple arithmetic. The value of a degree in one field as opposed to another, the value of time spent studying one thing instead of another, are highly personal matters. They will not mean the same things for different people. In the more important respects, the assessment of such damages relies at least as much on intuition as on any standard equation. In the Court's view, in contemplation of the Plaintiff's requested damages, a fair assessment of these other educational harms is **$1500.00.**

*Lost wages:* The Plaintiff was restricted from work from 2 March to at least 30 March 1988, when a transfer request was made by a Counselor for the Plaintiff. (Plaintiff's Proposed Findings of Fact and Conclusions of Law at 6 (Doc. 132); *see also* Trial Tr. at 41 lines 9–14.) Thus, for at least 28 days, Plaintiff lost $1.55 per day. That amounts to $43.40.

Since approximately 30 March 1988, Plaintiff has worked at 5–day per week jobs, which pay $1.45 per day. He has thus lost $1.55 per day on the weekends, and $0.10 per day during the week, or $3.60 per week. From 30 March 1988 to 3 November 1999 is 605 weeks; that number of weeks times $3.60 is $2178.00.

Accordingly, Plaintiff's total lost wages are: **$2221.40.**

■ *Punitive damages:* The law does not warrant a finding of punitive damages in this case. The Plaintiff has not shown by a fair preponderance of the credible

evidence that the Defendants were "motivated by evil motive or intent," or acted with "reckless or callous indifference to the federally protected rights of others." *See Smith v. Wade*, 461 U.S. 30, 56, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983); *see also Arroyo Lopez v. Nuttall*, 25 F.Supp.2d 407, 410 (S.D.N.Y.1998).

*Plaintiff's costs:* Plaintiff's claim for costs of his suit is **DENIED.**

■ *Other relief:* The Court finds that Plaintiff is entitled to pre-judgment compounded interest on the monetary awards for educational costs incurred because of loss of financial aid after Plaintiff's transfer from Eastern Correctional Facility, and for lost wages. *See Gierlinger v. Gleason*, 160 F.3d 858, 873–74 (2d Cir. 1998). Pre-judgment interest shall be at the "adjusted prime rate" established by the Secretary of the Treasury pursuant to 26 U.S.C. § 6621 (1999), calculated from the time at which Plaintiff had to pay the registration fee following the loss of his federal financial aid, and from the midpoint of the period for which back wages were due. *See E.E.O.C. v. County of Erie*, 751 F.2d 79, 80, 82 (1984).

The Court further finds that Plaintiff is entitled to post-judgment interest on all monetary awards, in accordance with 28 U.S.C. § 1961. All interest shall be compounded.

## IV.   *Acknowledgment*

The Court takes this opportunity to express its gratitude to Salvatore J. Piemonte, Esq., for his pro bono service as standby trial counsel for the Plaintiff. Such assignments are difficult ones, affording attorneys limited resources and time with which to prepare challenging cases. Mr. Piemonte's thorough preparation for the trial and the high quality of his representation of his client were exemplary, and the Court thanks him for this service.

## *CONCLUSION*

It is hereby ORDERED that Defendants are found liable to Plaintiff for **damages of $4221.40, plus pre-judgment interest and post-judgment interest as described above;** and

IT IS FURTHER ORDERED that each Defendant be equally liable for a share of fifty percent of the damages; and

IT IS FURTHER ORDERED that the memos associated with, and records of, this incident, found in Plaintiff's inmate file or other Correctional Services records, are to be expunged from his records; and

IT IS FURTHER ORDERED that the Clerk serve a copy of this order on all parties by regular mail.

IT IS SO ORDERED.