**Mujahid FARID, Plaintiff,**

v.

**Glenn S. GOORD, Acting Commissioner; R.K. James, Captain; Walter R. Kelly, Superintendent; T. Monin, Sergeant; Donald Selsky, Director of Special Housing; and R. Simmons, Correction Officer; Individually and in their official capacities, Defendants.**

No. 96–CV–0737C(F).

United States District Court, W.D. New York.

Feb. 9, 2002.

Kavinoky & Cook, LLP (Mark C. Poloncarz, of Counsel), Buffalo, New York, for Plaintiff.

Eliot Spitzer, Esq., Attorney General of the State of New York (Michael A. Siragusa, Esq., Assistant Attorney General, of Counsel), Buffalo, New York, for Defendants.

## I. INTRODUCTION

CURTIN, District Judge.

Plaintiff Mujahid Farid commenced this action, *pro se*, while in custody of the New York State Department of Correctional

Services ("DOCS"), at the Attica Correctional Facility ("Attica"). Farid brought this action pursuant to 42 U.S.C. § 1983, claiming violations of his First and Fourteenth Amendment rights. On August 4, 1998, the court assigned Mark C. Poloncarz, Esq., to act as attorney for Farid. Item 48.[1]

Defendants previously moved for summary judgment. Item 19. That motion was denied as premature. Item 52. The court ordered the parties to conduct any necessary discovery. *Id.*, p. 9. Discovery is now complete, and defendants have again moved for summary judgment. Item 60.

Numerous affidavits and deposition transcripts are on file in connection with this motion, including those relied on in the prior motion. The documents forming the record herein are: Defendants' Notice of Motion in Support of Defendants' Motion for Summary Judgment, dated July 18, 2000, Item 60; Affidavit of defendant Randy James, dated August 14, 1997, Item 21; Affidavit of defendant Walter R. Kelly, dated August 15, 1997, Item 22; Affidavit of defendant Richard Simmons, dated September 19, 1997, Item 23; Affidavit of defendant Donald Selsky, dated August 12, 1997, Item 24; Affidavit of defendant Thomas Monin, dated September 29, 1997, Item 25; Affidavit of Anthony J. Annucci, dated August 21, 1997, Item 26. Most affidavits have exhibits attached.

Also on file are: Declaration of Michael A. Siragusa, Esq., in Support of Defendants' Motion for Summary Judgment, dated July 18, 2000, Item 61; and Defendants' Statement of Undisputed Facts Pursuant to Local Rule 56, dated July 18, 2000, Item 62.

Attached to the Siragusa Declaration are numerous transcripts: Exhibit B, transcript from the December 9, 1999 Monin deposition; Exhibit C, transcript from the December 9, 1999 Simmons deposition; Exhibit D, transcript from the December 9, 1999 James deposition; Exhibit E, transcript from the December 9, 1999 deposition of Sibatu Khahaifa; and Exhibit F, transcript from the October 27, 1999 deposition of plaintiff Farid.

Also filed are: Plaintiff's Brief in Opposition to the Motion for Summary Judgment, dated September 13, 2000, Item 65; Plaintiff's Statement of Facts Pursuant to Local Rule 56, dated September 13, 2000, Item 66; and Plaintiff's Amended Statement of Facts Pursuant to Local Rule 56, dated October 18, 2000, Item 68.

The court issued an order dated June 29, 2001, Item 69, asking counsel whether they objected to including Farid's Article 78 decision by New York State Supreme Court Acting Justice Mark H. Dadd in the record. The State did not object, although it pointed out that the State Court decision had no *res judicata*/collateral estoppel effect here. Item 70. Farid's counsel did not object, Item 71, and the decision is now part of the record. Item 72.

All parties have briefed the issues relevant to this motion. Defendants did not request oral argument, and the motion was submitted for decision.

## II. FACTS

On April 12, 1996, Farid alleges that Corrections Officer Rademacher failed to allow adequate time for him and certain other inmates to finish their breakfast. Farid claims that Rademacher became abusive when he complained that another

---

1. Initially, Prisoner's Legal Services was appointed to represent Farid pursuant to an Order filed April 9, 1997. Item 4. However, Prisoner's Legal Services was permitted to withdraw when its funding was not renewed by New York State. Items 44, 46.

corrections officer, Sergeant Honiski, witnessed the event. Item 66, ¶¶ 8—9, and Ex. A. While acknowledging that an incident occurred at the time and place alleged by plaintiff, defendants deny any improper conduct by Rademacher.

On April 13, 1996, Farid prepared a petition ("Petition") entitled "Abusive Conduct by Correction Officer," which Farid and five other inmates signed, "requesting an official investigation of this officer and his conduct ...." Item 66, Ex. A. Farid sent the Petition directly to the Superintendent of Attica, defendant Walter R. Kelly, and Glenn S. Goord, Commissioner of DOCS. Item 61, Ex. F, p. 13.

The First Amendment claims brought by Farid revolve around the investigation into the charges contained in the Petition and the investigation of another incident that occurred on April 15, 1996. The April 15 incident involved a search of Farid's cell and work area, as a result of which charges were lodged against him in a Misbehavior Report. Farid asserts that the searches were motivated by an intent to retaliate against him for complaining about Rademacher via the Petition. Item 61, Ex. E, p. 19. He also asserts that his First Amendment rights were violated by imposition of the disciplinary charges for authoring and possessing certain articles found during the search of his work area. In the circumstances of this case, it is important to consider who authorized the search of Farid's cell and work area, and the timing of the searches and severity of the charges in relation to the investigation of the Petition.

As indicated by a date-stamp, defendant Kelly received the Petition on April 15, 1996. Item 66, Ex. B. Kelly forwarded it down the chain of command for investigation. First, the Petition went to Deputy Superintendent E.R. Donnelly, *via* a transmittal dated April 15, 1996. *Id.* at Ex. C.

Then, Donnelly forwarded it to his subordinate, Lt. Khahaifa, *via* a transmittal dated April 15, 1996. *Id.* at Ex. D.

Ultimately, Khahaifa forwarded the Petition to his subordinate, defendant Monin, where it remained for investigation and response. However, in what appears to be a departure from usual procedure, there exists no transmittal slip from Khahaifa to Monin. As discussed *infra,* the parties disagree on the issue of whether defendant Monin received the Petition from Khahaifa on April 15, or sometime thereafter. There is an annotation on the face of the transmittal from Donnelly to Khahaifa which reads: "Recv'd 4–17–96 Rademacher." *Id.* Monin testified that he made that note and that it indicates the date he received the transmittal. Item 61, Ex. B, p. 12. During his deposition, Khahaifa could not rule out having spoken to Monin about the Petition on the day he received the transmittal from Donnelly (April 15). Item 61, Ex. E, pp. 7–8. Farid, in his deposition, noted that he had filed petitions on a number of other occasions (Item 61, Ex. F, pp. 65, 66), and it had been his experience that he would receive a response to the complaint on the very day it had been filed. *Id.,* p. 73.

At the time Farid prepared the Petition, there was an inmate grievance procedure available to inmates at Attica. On numerous occasions, he had availed himself of that procedure. Item 66, ¶¶ 51–58. However, Farid did not have confidence in the grievance process and opted instead to complain about officer Rademacher directly by petition. *Id.* He did not believe it violated any rule or regulation to have the Petition signed by other inmates who he alleges were also affected by defendant's conduct. *Id.* at ¶ 58.

In a seemingly unrelated incident on April 15, an inmate named Pratt was preparing for a family visit. He had in his

possession a copy of an article entitled "The Rude Awakening of RIP" ("Rip Article") dated July 1995, which Farid had authored. Pratt wanted to take a copy of the article with him on his visit to give to his fiancee. As required by the rules, he voluntarily showed the article to the corrections officer serving as package window clerk prior to taking it into the visit. *See* testimony of Pratt, Transcript from Farid's Tier III Hearing at 9. A copy of the Tier III Hearing Transcript is attached as Ex. E to James Aff. ("Tier III Trans."), Item 21. A copy of the Rip Article which Pratt delivered to the package window officer is attached to the Simmons Aff., Item 23, as Ex. B.[2] Farid denied knowing inmate Pratt prior to the April 15 incident and testified that he had no idea how Pratt obtained a copy of the article. Item 21, Ex. E, p. 7. Pratt testified that he did not know Farid and that he found a copy of the article in a cell he was cleaning. *Id.* at 9.

## A. *Farid's Cell and Library Work Station Searches*

The package window officer, who was neither identified nor deposed, refused to allow Pratt to take the article into the visiting room, telling Pratt it could be "misconstrued." Item 21, Ex. E, p. 9. The officer contacted defendant Simmons, a corrections officer assigned to "B" Block where Farid was then housed. Item 23, ¶ 4. Simmons in turn contacted Monin, the "B" Block Supervisor, about the article, and pointed out that Farid's name was on the document. Simmons explained the circumstances surrounding the receipt of the document to Monin. Item 61, Ex. C, p. 6. Monin reviewed the Rip article, Item 25, ¶ 5, and felt it was "inflammatory." Item 61, Ex. B, p. 6. C.O. Simmons recounted that "[a]s a result of the volatile and inflammatory content of the article," Sgt. Monin ordered a search of Farid's cell and his work area in the law library. Item 23, ¶ 5.[3] Item 61, Ex. B, p. 6. The cell search occurred while Farid was at his job in the law library. Item 23, ¶ 5.

The contraband receipt, signed by N. Petito, reports that two documents were seized from Farid's cell and ultimately treated as contraband: an "unauthorized Petition" (a copy of the April 13, 1996 Petition), and "various ACF copy machine illegal copies." Item 23, Ex. D.

2. The record contains numerous references to allegations that Pratt was attempting to "smuggle" the article out of the prison. However, it is established by available documentary evidence and testimony that Pratt voluntarily surrendered the article for review by the package window officer, as required before taking it with him on his visit. Furthermore, Pratt was never charged with any disciplinary violations (Item 21, Ex. E, pp. 10–11), and the smuggling charge was the one charge against Farid that was dismissed at the disciplinary hearing.

3. It is confusing and unclear who ordered the search of Farid's cell. In spite of Simmons' and Monin's testimony that Monin ordered the cell and library searches, Item 61, Ex. B, p. 6, other evidence indicates that a Lieutenant Bradt ordered the cell search. Item 21,

Ex. E, p. 18. The "Inmate Misbehavior Report," containing the disciplinary charges against Farid, written by defendant Simmons, states that the cell search was conducted "by order of the watch commander (Lt.Bradt)." Item 21, Ex. A. However, the documents generated subsequent to the cell search indicate otherwise. A "Cell Frisk Log Sheet" indicates that Farid's cell was searched pursuant to the authorization of Lieutenant Kirkpatrick. Item 23, Ex. D. Defendant Simmons identified the documents attached as Exhibit D to his affidavit as "documents generated relative to the search of plaintiff's cell and work area ...." Item 23, ¶ 9. A "Search Contraband Report" concerning the search of Farid's cell identifies the "Supervisor Authorizing Search" as Lieutenant Sweeney. Item 23, Ex. D.

Prior to or contemporaneously with the Library Search, defendant Monin ordered Farid, who had been working in the law library, returned to the block. Item 61, Ex. C, pp. 5–6. On his way back to his cell, Farid was stopped and questioned by defendants Simmons and Monin about the Rip Article. *Id.*, pp. 6–7; Item 66, ¶¶ 21–22. Farid admitted to Simmons and Monin that he wrote the article and had a right to do so. *Id.*, ¶ 23.[4]

Although Officer Simmons denied that he was involved in the search of Farid's work area in the law library, Item 23, ¶ 5, his signature appears on the contraband receipt as "officer conducting search" of Farid's work area.[5] Item 23, Ex. D. The time of day that the searches took place is not indicated on any of the documents. The following items were seized from Farid's law library work station and treated as contraband: (1) a copy of a membership application form for The Center for Law and Justice ("CFLJ"), which had previously completed information whited-out; (2) various allegedly non-legal documents found on Farid's law library disk; (3) an-

other article written by Farid entitled, "The Prison Industrial Complex (Or the Final Solution to the Three–Fifths Problem)," ("Three–Fifths Article"); and (4) copies of the Rip Article. Item 21, Ex. E, p. 2; Item 21, Ex. A (Inmate Misbehavior Report); Item 23, Ex. D (Contraband Report and Receipts).

The Rip Article draws parallels between the New York State prison system and its prisoners and the fable of Rip Van Winkle. Simmons comments that the article advocates the use of violence and "mass prisoner mobilization" as a means to redress what Farid alleges constitutes "deplorable conditions in prison." Item 23, ¶ 4. The Rip Article concludes: "If Pataki's vicious onslaught doesn't provide the catalyst for mass prisoner mobilization, then what else could?" Simmons and Monin maintain that the article contained "volatile and inflammatory" language. Item 23, ¶ 5; Item 25, ¶ 6. Given their interpretation of the Rip Article, Simmons and Monin claim that the ensuing searches of Farid's work area in the prison law library and Farid's cell were justified.[6] Item 61, Ex. B, p. 6.

---

**4.** There is some confusion regarding whether Farid was questioned only about the Rip Article, or about both articles. Simmons' Affidavit seems to indicate that Farid was questioned only about the Rip Article. Item 23, ¶ 8; Item 25, ¶ 7. *But see* Item 61, Ex. C, pp. 6–7, and Item 66, ¶¶ 19—23, indicating Simmons and Monin questioned Farid about the Rip Article and the Three–Fifths Article.

**5.** During his deposition, Simmons explained his signature on the Contraband Receipt as "my receipt to inmate Farid for the articles that were taken from the law library; not necessarily taken by me ...." Item 61, Ex. C, p. 11. However, he admitted that the officer who conducts the search usually fills out the form. *Id.*, pp. 13–14. Elsewhere, however, Simmons affirms that he "was not involved in the search of plaintiff's cell, nor the search of plaintiff's work area in the law library." Item 23, ¶ 5.

**6.** There are two versions of the Rip Article in the record on this motion. The one obtained from inmate Pratt is discussed above. A slightly different version was found in Farid's law library work station. Item 66, Ex. E; Item 61, Ex. F, pp. 58—59. Farid testified that the version found in the search of his library work station was an "updated" version of the article. *Id.* Upon review of these documents, the court finds a statement concerning "mass prisoner mobilization" but can find no statement regarding "deplorable conditions." The "mass prisoner mobilization" language appears in two contexts. The first: "It is an historical fact that mass prisoner mobilization, coupled with the civil rights movement, was the principal cause of much of the reform in the early 1970s." Item 23, Ex. B, p. 2. The second: "If Pataki's vicious onslaught doesn't provide the catalyst for mass prisoner mobilization, then what else could? One thing for sure, Rip has been given the wake-up call." *Id.* at p. 5.

Farid describes both the Rip and Three–Fifths articles as "neither inflammatory nor detrimental to the safety of the prison but are instead well written, satirical, and recite various aspects of prison life." Item 66, ¶ 43. He noted that the Rip article was published in *The Middletown Times Herald,* the local newspaper in the community where he was incarcerated before his transfer to Attica. Item 61, Ex. F, pp. 59–60.

As indicated *supra,* Farid alleges that the searches conducted by defendants were motivated by an intent to retaliate against him for complaining about Corrections Officer Rademacher *via* the Petition. Item 61, Ex. F, p. 19. Thus, Farid alleges that the retaliatory searches violated his First Amendment right to petition the government for redress. This claim makes it essential to determine whether defendants knew about the Petition before or after the searches in question.

Farid also argues that his First Amendment rights were violated by imposition of disciplinary charges and penalties for authoring and possessing the Rip Article and the Three–Fifths Article found during the search of his law library work station. Item 65, pp. 8—9.[7] The possession of the two articles, as well as the Center for Law and Justice Application and a copy of the Petition, were also cited as grounds for disciplinary measures against him. Item 21, Ex. E, pp. 18—19; Item 21, Ex. A. Logically, he argues, the possession of the documents could not be treated as a violation of prison rules, nor considered detrimental to prison security, unless their content was considered. Additionally, the Tier III finding of guilt for violation of Rule 102.10, making threats (see p. 13, *infra* ), depends entirely on the evaluation of the content of the documents. Item 21, Ex. E, p. 19.

Simmons and Monin claim that they first learned of the Petition when it was seized as contraband from Farid's cell on April 15. Item 23, ¶ 9; Item 25, ¶¶ 8, 10. Farid disputes this time frame, arguing that it is likely that Monin knew about the Petition prior to his cell and work area search. Noting that the Petition was immediately forwarded down the chain of command on April 15, and ultimately from Lt. Khahaifa to defendant Monin, Farid argued in his Memorandum of Law:

> The exact date that Lieutenant Khahaifa either spoke to Monin or forwarded the matter to Monin is unknown. During his testimony Khahaifa could not rule out speaking with Monin with regard to this matter. It is possible that Lieutenant Khahaifa spoke to Monin about the matter on the day he received the request from Donnelly [April 15, 1995]. During his deposition, Khahaifa, in response to questions about what he did after receiving the buck slip [transmittal] from Deputy Supt. Donnelly, stated that he "[s]poke to Sergeant Monin probably.

> It was an incident in B Block and he was the B Block sergeant. So that would be my next course of action, to get in touch with the block sergeant and have him interview the inmate if I was not going to specifically interview him."

Item 65, p. 6, *citing* Khahaifa Dep. (Item 61, Ex. E) at pp. 7–8. *See also* Item 66, ¶¶ 15—16. Monin asserts he was assigned

---

7. The copy of the Three–Fifths article in the record bears the date May 1996. Item 66, Ex. F. No attempt is made to reconcile the fact that this article is dated *after* the date the searches were conducted. One possible explanation is that the documents actually seized and subsequently used at the Tier III hearing were ordered destroyed after the hearing by the hearing officer, Captain James. Item 21, Ex. D.

to investigate the allegations in the Petition on April 17, 1996. Item 25, ¶ 15.

### B. The Disciplinary Charges

For possession of the alleged contraband, Monin ordered Farid detained in keeplock pending investigation, which led to disciplinary charges. Item 25, ¶ 23. After being released from keeplock on April 18, because the investigation was not completed within 72 hours, Farid was *again* placed in keeplock on April 19 pending resolution of the disciplinary charges and completion of the disciplinary process. *Id.*, ¶¶ 23, 24. On April 19, defendant Simmons prepared a misbehavior report charging Farid with the following violations:

102.10 —Inmates shall not, under any circumstances, make any threat, spoken, in writing, or by gesture.

103.20 —Inmates shall not request or solicit goods or services from business or any person other than immediate family members without the consent and approval of the facility superintendent or designee.

104.12 —Inmates shall not lead, organize, participate, or urge other inmates to participate, in work-stoppages, sit-ins, lock-ins, or other actions which may be detrimental to the order of facility.

114.10 —Inmates shall not smuggle or attempt to smuggle or solicit others to smuggle any item in or out of the facility or from one area to another.

116.10 —Inmates shall not lose, destroy, steal, misuse, damage or waste any type of State property.

7 N.Y. ADC 270.2; Item 21, ¶ 3 and Ex. A. The misbehavior report was served on Farid on April 22, 1996. *Id.* at ¶ 4. He was found guilty in a Tier III hearing on all

but the smuggling charge. Although Farid does not raise this point, the court finds it difficult to determine which charge (specifically, the one relating to making a threat, and the one relating to action detrimental to the order of the facility) relates to which document; the Misbehavior Report does not connect the specific charges to the specific documents.

In the Misbehavior Report, Simmons recited the various rule violations, and then described the events surrounding the filing of the charges. He noted that after the searches, he asked Farid if he had authored the Rip article, to which Farid answered, "Yes. I'm entitled to my viewpoints. You don't necessarily have to agree to them." Item 21, Ex. A. Simmons then stated: "it should be noted that this article contained Inflammatory Information in regards to DOCS operations ...." *Id.* He commented that finding "numerous" copies of the article also showed Farid's "intention to distribute these among the population." *Id.* Simmons noted that the other items of concern were the "unofficial Petition filed against a staff member," the Three–Fifths Article, the CFLJ application, and yet another 28–page article, entitled "One God Must Die" which indicated "ACF 10"[8] on it. *Id.*

Simmons concluded that the Rip Article was detrimental to the order of the facility, based solely upon his reading of the article. Item 61, Ex. C, p. 24. Yet, Simmons acknowledged that in cases where a document's appropriateness was at issue, questions about censorship were determined by committee: "we have media review process that them types of articles would go through." *Id.* at 25—26. There is no evidence that Simmons ever submitted any

---

**8.** ACF 10 indicates the Attica Correctional Facility Law Library copy machine. Item 21, Ex. A. Farid worked in the Law Library.

of the documents seized from Farid, upon which the disciplinary charges were based, to the media review committee. It is reasonable to assume that if the documents at issue were called to the attention of the Media Review Committee, the Committee would review them pursuant to Directive 4572. *See infra*, Section IV(E).

### C. Investigation of the Petition

Ultimately, Monin investigated the complaint against Rademacher that Farid made via the Petition. Monin's report to Lt. Khahaifa is dated April 23, 1996. Item 25, Ex. B. Monin states that Farid and one other signatory to the Petition refused to be interviewed about the incident. He spoke to the four other signatories, who confirmed that the incident occurred and that Rademacher's comments were inappropriate. However, those signatories apparently agreed it was an isolated incident. Officer Rademacher denied any improper conduct. Item 22, Ex. A.

In his report, Monin notes that there were approximately 30 inmates at breakfast at the time of the incident, and only six had any problem with Rademacher. Then, without giving any reason, he concluded, "It should be further noted that the six inmates who signed the petition are of the Muslim faith who obviously conspired together to compose this complaint." *Id.* Farid claims that Monin had a general disdain for Muslim prisoners. Item 61, Ex. F, pp. 84–85.

Farid offers additional testimony that Monin harbored animosity towards him personally. He alleges that Monin once stopped him on the block and said: "[w]hy don't [you] go back to Africa and do some complaining there." Item 61, Ex. F, pp. 82–83. Plaintiff claims that Monin made similar derogatory comments to him on several occasions and that defendant Sim-

mons was present on many of those occasions. *Id.*

DOCS Commissioner Goord referred Farid's Petition to George Bartlett, DOCS Deputy Commissioner, for a response. In a letter to Farid dated May 30, 1996, Mr. Bartlett referred to Supt. Kelly's investigation into Farid's allegation, and found that four of the thirty inmates interviewed "indicated if they were not given sufficient time to eat, it was an isolated situation." Item 22, Ex. B. He concluded that no evidence had been found to support Farid's allegations. *Id.* Mr. Bartlett may also have based his report on the investigation conducted by Attica First Deputy Superintendent, Michael Giambruno, who wrote a memorandum about the incident to Israel Rivera, Assistant Commissioner of DOCS. Item 25, Ex. E.

Based on the confusion created by defendants' own documents and testimony over who ordered the cell search, Farid argues that Monin's testimony concerning when he learned of the Petition is inherently suspect and should be disregarded as "self-serving." Item 65, p. 7. Defendants argue that Farid has no objective evidence that Monin knew about the Petition before the cell and work area searches were conducted, and that Farid's argument is purely speculative and insufficient as a matter of law.

### D. The Tier III Hearing

Defendant James was assigned as the hearing officer for the Tier III disciplinary hearing on the charges brought against Farid. After Corrections Officer L. Bek was assigned as Farid's "inmate advocate," he met with him on April 23, 1996. Item 66, ¶ 27; Item 21, ¶ 4 and Ex. C. Farid and Bek identified the following witnesses they wished to call at the Tier III hearing: inmates Tindel, Jones, and Pratt, and Lt.

Bradt and Officer Petito. *Id.* The hearing was held on April 24.

Farid first sought James' recusal as hearing officer. That request was summarily denied, with James refusing to hear argument. Item 21, Ex. E, p. 3. Farid explained during his deposition that he had some questions about the impartiality of Officer James based on information he possessed that James may have been a "crusader" who targeted Muslim inmates. Item 61, Ex. F, pp. 67–69.

Farid next sought to raise an argument that the hearing was untimely. James also summarily rejected that argument without giving Farid an opportunity to argue the point. Item 21, Ex. E, p. 3. Later, this was the basis upon which the New York State Supreme Court nullified the Tier III process and ordered Farid's record expunged.

After the inmate witnesses were called, Farid sought to call corrections personnel, Lt. Bradt and Officer Petito, who were on his witness list. *Id.,* pp. 17–18. He argued that the testimony of Lt. Bradt was relevant because documents indicated he ordered the cell search, and there was significant confusion on that issue created by available documents. He asserted that the testimony of Officer Petito was also relevant because he actually conducted the search of his cell. Farid wanted to introduce evidence that there was no copy of the Petition in his cell when Petito searched it, a fact that would support his argument that Monin and Simmons knew about the Petition independent of the searches and that the Petition precipitated the search. *Id.,* p. 18.

Defendant James refused Farid's request to call those two witnesses, finding that Bradt's testimony would be irrelevant and Petito's testimony would be redundant. *Id.* at 18—19. *See also* Item 21, Ex. F. James accepted without question

the chronology set forth in Simmons' Misbehavior Report, *i.e.,* that Monin and Simmons did not know about the Petition until *after* the searches in question. *Id.* at ¶ 12 and Ex. F.

Denying Farid's request to call Petito and Bradt as witnesses, Capt. James stated that the charges against him concerned *possession* of contraband only.

> This witness [Petito] was denied due to redundancy. You acknowledged possession of the unauthorized petition in your work area and you have stated that your whole purpose in calling CO Petito is to verify that you did not possess a copy in your cell. Both the misbehavior report and 2077 forms indicate that a copy was found in both your cell and work area. Possession is the issue, and you have acknowledged possession.

Item 21, Ex. E, p. 19.

Furthermore, Capt. James dismissed out of hand any argument by Farid that the searches which found the alleged "contraband" were motivated by any retaliatory intent. *Id.* Regarding the documents at issue, James's findings were as follows:

1. *Rip Article, Three–Fifths Article, and the Petition.* James stated that "[m]y review of the papers [the Rip Article and apparently, *sub silentio,* the Three–Fifths Article] indicate a clear attempt at urging participation in actions detrimental to facility order ...." He continued: "The incitful [sic] material is very threatening." This interpretation supported James's conclusion that Farid violated Rule 102.10. Item 21, Ex. D ("Hearing Disposition Rendered"). James referred to the Petition as "unauthorized" during the course of the hearing, but took no testimony concerning the charge that Farid violated Rule 104.12 (demonstration). He found that Farid had "acknowledged possession of the unauthorized petition in your work area .... Pos-

session is the issue ...." Item 21, Ex. E, p. 19, and thus was guilty of the charge. James ultimately concluded that "The inciteful material is very threatening." *Id.* at 19. However, he never articulated how the various writings were inflammatory, other than providing his conclusory assessment which echoed the appraisal of Monin and Simmons.

*2. Smuggling.* Farid had been charged with a violation of Rule 114.10—smuggling. This charge alleged that he had caused inmate Pratt to attempt to "smuggle" the Rip Article out on a visit. He was found not guilty on this charge.

*3. CFLJ Application.* The hearing officer found that possession of the CFLJ application indicated Farid's intent to solicit money from other inmates because there was a $5.00 membership fee payable to CFLJ. Item 21, Ex. E, p. 20. The hearing officer found that because he whited out information on this previously completed application form, Farid intended to distribute it. Farid admitted as much; although he denied he had an actual opportunity to distribute the form before disciplinary charges were brought. Item 21, Ex. E, p. 20; Item 66, ¶¶ 46—47. The hearing officer concluded that his intent to distribute the CFLJ application violated Rule 103.20. Item 21, Ex. E, p. 20. Farid did not think it would be against the facility's policies to ask other inmates if they would be interested in joining an approved organization that he himself had already received approval to join. Item 65, p. 11.

*4. Various 'ACF 10' Copies.* The hearing officer concluded that "your article was copied in the law library in your work area, and that is sufficient proof that you copied these non-legal materials against the guidelines and procedures misusing the copier. None of the written material is remotely legal in nature and is contraband in the law library." Item 21, Ex. E, p. 20. This was found to violate Rule 116.10 as a misuse or waste of state property. Farid claimed that the articles were legal, not personal, material. Item 21, Ex. E, pp. 6–7. He testified at his deposition that he had always paid for non-legal copies. Item 61, Ex. F, p. 43.

To impress upon Farid "the serious nature of this type of organized disruption," James imposed a penalty of six months of keeplock with one month suspended, a recommendation for thirty days loss of good time; and six months loss of certain privileges including: packages, commissary, telephone, and personal television, with one month suspended. James also recommended that Farid's position as an employee in the law library be reconsidered. *Id.* at 19, 20. James ordered the destruction of all the material seized as contraband and used as evidence at the hearing.

Farid sought review of the Tier III findings through normal channels provided by state law. His appeal was decided by defendant Selsky, Deputy Commissioner of the Department of Correctional Services. Selsky affirmed the findings of defendant James in a one-sentence decision rendered on June 21, 1996. Item 21, Ex. I; Item 24, ¶¶ 6—7. The decision read, "On behalf of the Commissioner and in response to your recent letter of appeal, please be advised that your Superintendent's Hearing of April 24, 1996, has been reviewed and affirmed on June 21, 1996." Item 21, Ex. I.

Thereafter, Farid commenced an Article 78 proceeding in New York State Supreme Court, Wyoming County, challenging the legitimacy of the Tier III hearing.

That decision, which ordered that Farid's record be expunged of all references to the Tier III hearing, was based on the fact that the hearing did not commence within seven days of Farid's confinement, as re-

quired by 7 NYCRR 251–5.1(a). Item 72. Interestingly, Justice Dadd, in dicta, commented that:

> the record shows that the hearing officer stated insufficient grounds for refusing to interview the officers who authorized and conducted the search of his cell as witnesses pursuant to the petitioner's request (see Exhibit F, p. 19; see *Matter of Wong v. Coughlin*, 137 A.D.2d 272, 529 N.Y.S.2d 45 [1988]). Petitioner sought to challenge the basis for the cell search and to prove that the charges were filed in retaliation for a complaint he had filed against an officer. Petitioner had a right to present such proof (see *Matter of Wilson v. Coughlin*, 186 A.D.2d 1090, 590 N.Y.S.2d 798 [1992]; *Matter of Patterson v. Coughlin*, 198 A.D.2d 899, 604 N.Y.S.2d 458 [1993]). Furthermore, it appears that the disposition was partly based upon the hearing officer's review of the content of the written materials seized from the petitioner's cell. Since these materials were destroyed as contraband, the record is insufficient for full judicial review of this matter and further administrative hearings on the report would be impossible (see *Matter of Bell v. Coombe*, Supreme Court of Wyoming County, Index No. 17,346, Memorandum and Judgment dated March 27, 1995, annexed).

*Farid v. Goord*, Index No. 17,905, New York State Supreme Court, Wyoming County, Dec. 2, 1996.

### III. PLAINTIFF'S CLAIMS

#### A. RETALIATION FOR PETITION

Farid alleges that he had a First Amendment right to prepare and send the Petition and that defendants violated that right by retaliating against him by means of the searches and disciplinary measures taken against him.

#### B. CONTENT AND POSSESSION OF CERTAIN DOCUMENTS

Farid was found guilty at the Tier III Hearing of violating disciplinary rules by possessing the Petition, the Rip Article, and the Three–Fifths Article. Captain James found these documents urged "participation in actions detrimental to the facility order," and evidenced an intent to distribute "inciteful material." Item 21, Ex. E, p. 19.

Farid alleges that he had a First Amendment right to possess these documents. Further, he claims that the discipline imposed was content-based and did not rely exclusively on possession. Item 65, pp. 10–11. He argues that James could not consider the documents contraband and dangerous to prison security unless he read them. Although at one point in the Tier III hearing James stated the charge related to the contraband articles centered on possession, he admitted that he had read them and found them "detrimental to the order of the facility." Item 61, Ex. D, p. 15.

#### C. DUE PROCESS

Farid alleges that he was not provided with a fair Tier III hearing in violation of the Due Process clause of the Fourteenth Amendment. Specifically, he claims that defendant James's refusal to hear argument on the issues of recusal and timeliness, and James's refusal to allow him to call Lt. Bradt and Officer Petito as witnesses, violated the procedural due process protections afforded inmates in prison disciplinary hearings. Farid alleges that James's unquestioning acceptance of the chronology set forth in the misbehavior report, *i.e.* that Monin and Simmons learned of the Petition after the cell and law library searches, evidenced his bias as hearing officer. Item 65, p. 12.

Farid noted that he prevailed in a State Court Article 78 proceeding upon establishing to the satisfaction of the state court that there was a procedural defect in the Tier III hearing. *Id.*

## IV. DISCUSSION

### A. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In reviewing a motion for summary judgment, the court is required to view any permissible inferences to be drawn from the underlying facts in the light most favorable to the non-moving party. *Skubel v. Fuoroli,* 113 F.3d 330, 334 (2d Cir.1997).

The movant seeking summary judgment has the initial burden of identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact. Fed. R.Civ.P. 56(c). However, once this burden has been met, the non-moving party "may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (quoting Fed.R.Civ.P. 56(e)). Moreover, "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

The Second Circuit has repeatedly held that a court must be cautious in granting summary judgment where a party's state of mind is at issue. *Chertkova v. Connecticut General Life,* 92 F.3d 81, 87 (2d Cir. 1996). This is particularly true where the moving party possesses the evidence most likely to demonstrate the required knowledge or intent. In such cases, the court must carefully scrutinize the record for circumstantial proof which supports the opponent's allegations. *Id.* "If reasonable minds could differ as to the import of the evidence and ... there is any evidence in the record from any source from which a reasonable inference in the nonmoving party's favor may be drawn, the moving party simply cannot obtain a summary judgment." *Brady v. Town of Colchester,* 863 F.2d 205, 211 (2d Cir.1988) (quotation and citation omitted). *See also Finley v. Giacobbe,* 79 F.3d 1285, 1291 (2d Cir.1996).

### B. DISMISSAL FOR LACK OF PERSONAL INVOLVEMENT

 As a preliminary matter, certain defendants may be eliminated at this stage of the proceedings. "It is well settled in this Circuit that 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983'." *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (quoting *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994)). The personal involvement of a supervisory defendant may be shown by evidence that: (1) the defendant participated directly in the alleged constitutional violation; (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong; (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom; (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts; or (5) the defendant exhibited deliberate indifference to the rights of inmates by

failing to act on information indicating that unconstitutional acts were occurring. *Colon,* 58 F.3d at 873 (citation omitted).

■ No evidence links the administrators of the Department of Correctional Services, nor the upper management of Attica, with improper conduct nor animus towards Farid. As to defendant Superintendent Kelly, his only participation is that he received plaintiff's Petition on April 15 and sent it down the chain of command for investigation. Defendant Goord is sued as Acting Commissioner of DOCS. The record reveals only that Goord referred Farid's Petition to Deputy Commissioner Bartlett for investigation. Item 22, Ex. B. Defendant Selsky's exclusive involvement is as DOCS' designee to hear Tier III appeals. *See Turner v. Grant,* 2000 WL 362032 (W.D.N.Y., Mar.29, 2000) ("The court has found no constitutional violation related to plaintiff's disciplinary hearing to which defendant Selsky might have been alerted by plaintiff's appeal.") *Id.* at *6.

No allegations are made that any of these individuals were personally involved in the events at issue, nor that their policies or neglect led to those events. Therefore, the action is dismissed with prejudice as to defendants Glenn S. Goord, Walter R. Kelly, and Donald Selsky. The remaining defendants are: Captain Randy James, Correction Officer Richard Simmons, and Sergeant Thomas Monin.

## C. STATE LAW CLAIMS

■ In his complaint, Farid alleges that defendants Simmons, Monin, and James violated the state law of conversion and DOCS regulations regarding confiscation and destruction of his documents. Item 1, Fifth Cause of Action. The court agrees with defendants' position that the state law claims for damages against correctional officers "shall be brought ... in the court of claims as a claim against the state" pursu-

ant to New York Corrections Law § 24(2). Thus, a federal court, acting as a state court in addressing pendent state law claims, would not have jurisdiction in such an action. *Baker v. Coughlin,* 77 F.3d 12 (2d Cir.1996). The court thus grants summary judgment to all defendants on this claim.

## D. RETALIATION FOR PETITION

■ Farid argues that the cell and library searches, and the discipline imposed thereafter, were in retaliation for the exercise of his First Amendment right to petition the government for redress. It is settled law that an inmate's "right to complain to public officials and to seek administrative relief is protected by the First Amendment." *Gaston v. Coughlin et. al.,* 81 F.Supp.2d 381, 386 (N.D.N.Y.1999), *citing Gagliardi v. Village of Pawling,* 18 F.3d 188, 193 (2d Cir.1994). *See also Taylor v. Sullivan,* 980 F.Supp. 697, 704 (S.D.N.Y.1997); and *Franco v. Kelly,* 854 F.2d 584, 585 (2d Cir.1988). In *Hynes v. Squillace,* 143 F.3d 653, 657 (2d Cir.1998), the Second Circuit held:

> In order to sustain a retaliation claim, the plaintiff must demonstrate that he engaged in constitutionally protected conduct and that the "protected conduct was a substantial or motivating factor in the prison officials' decision to discipline the plaintiff." *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996). Once the plaintiff carries his initial burden, "the defendants must show by a preponderance of the evidence that they would have disciplined the plaintiff 'even in the absence of protected conduct.'" *Id., quoting Mt. Healthy City School Dist. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977).

On the issue of retaliation, the defendants offer direct evidence in the form of Monin's and Simmons' affidavits, and de-

position testimony, denying any retaliatory motive and asserting that neither knew about the Petition until after the cell and library searches. Defendants argue that there is no genuine issue of material fact on this point.

The Second Circuit noted that the ease with which prisoners can assert retaliation claims warrants close scrutiny of those claims: "[B]ecause we recognize both the near inevitability of decisions and actions by prison officials to which prisoners will take exception and the ease with which claims of retaliation may be fabricated, we examine prisoner's claims of retaliation with skepticism and particular care." *Colon v. Coughlin, et al.,* 58 F.3d 865, 872 (2d Cir.1995), *citing Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983).

### 1. Did Farid Engage in Constitutionally Protected Conduct?

 The first *Hynes* factor to be analyzed in determining whether a First Amendment retaliation claim survives summary judgment is rather straightforward. Farid's claimed conduct, filing a petition, is constitutionally protected. *Graham v. Henderson,* 89 F.3d 75, 80 (2d Cir.1996); *Franco v. Kelly,* 854 F.2d 584, 588–89 (2d Cir.1988). "[R]etaliation against a prisoner for pursuing a grievance violates the right to petition government for the redress of grievances guaranteed by the First and Fourteenth Amendments and is actionable under § 1983." *Graham,* 89 F.3d at 80. The right to petition government for redress of grievances-in both judicial and administrative forums-is " 'among the most precious of the liberties safeguarded by the Bill of Rights.' " *Franco v. Kelly,* 854 F.2d at 589, quoting *United Mine Workers v. Illinois State Bar Ass'n,* 389 U.S. 217, 222, 88 S.Ct. 353, 19 L.Ed.2d 426 (1967).

Defendants, citing *Duamutef v. O'Keefe,* 98 F.3d 22 (2d Cir.1996), argue that Farid did not have a constitutionally protected right to circulate inmate petitions. Item 36, pp. 8–10. The Second Circuit has held that "prison regulations provide an effective procedure for inmates to communicate their grievances to prison authorities.... So long as [the grievance procedure] is open, we believe it is *permissible* for prison officials to bar the circulation of petitions." *Duamutef,* 98 F.3d at 24 (emphasis added). In his affidavit, Defendant Kelly asserts, "Commonly, inmates use that grievance process to challenge the denial of a privilege or a violation of the minimum conditions of their confinement." Item 22, ¶ 19. However, he points to no rule or regulation that prohibits inmates from petitioning the Superintendent directly.

Secondly, neither Superintendent Kelly, Commissioner Goord, nor anyone else on the chain of command disciplined Farid for sending the Petition. Instead, both Goord and Kelly forwarded it through channels so that the charges could be investigated. From these facts, it can be inferred that petitioning was a proper—or at least non-objectionable—means to communicate grievances. *See Richardson v. Coughlin,* 763 F.Supp. 1228, 1234–35 (S.D.N.Y.1991). These facts also belie Kelly's assertions in his affidavit that "plaintiff does not have a right to circulate a petition challenging the conditions of confinement in a correctional facility," while providing no authority for the same. Item 22, ¶ 19.

Because *Duamutef* did not forbid petitions, but made exercise of that constitutional right dependent on whether the prison official barred it, and because there is nothing in the record indicating that such a regulation was in effect at Attica at the time of the incident, the court finds

that the first *Hynes* factor, whether Farid engaged in protected conduct, is met.

## 2. Was the Protected Conduct a Substantial or Motivating Factor in Farid's Discipline?

 The next *Hynes* factor requires the court to determine whether the filing of the Petition was a substantial or motivating factor in Farid's subsequent discipline. Farid alleges that the Petition prompted the discipline; defendants assert it did not. At the very least, a question of material fact exists concerning this issue.

 Circumstantial evidence can serve as evidence of retaliation. *Colon,* 58 F.3d at 872. However, the *Colon* court said: "If this circumstantial evidence represented the sum total of Colon's proof, we might be inclined to affirm the grant of summary judgment based on the weakness of Colon's case." *Id.* at 873. *See Gaston v. Coughlin,* 81 F.Supp.2d 381, 386 (N.D.N.Y. 1999). Mindful of the limitations on Farid to access defendants' motivations, the court finds enough factors that weigh in his favor to find that his claim is substantial and his Petition may have prompted the disciplinary charges.

Farid claims that Monin had a pre-existing bias against inmates of the Muslim faith in general. He points to gratuitous language about a conspiracy of Muslim inmates hypothesized by Monin in his April 23, 1996 investigation report concerning the April 12 breakfast incident, Item 25, Ex. B, and to other derogatory and harassing comments such as: "[W]hy don't [you] go back to Africa and do some complaining over there." Item 66, ¶ 65. Taking the facts in the light most favorable to Farid, these comments could serve as circumstantial evidence of retaliatory intent.

Moreover, there is "temporal proximity" between the receipt of the Petition by the Attica administration and the disciplinary action against Farid. *Gaston,* 81 F.Supp.2d at 386. Concerning whether Monin may have known about the Petition on the day of Farid's cell and law library search, Khahaifa could not rule out speaking to Monin regarding Farid's Petition on April 15, the date Khahaifa received the transmittal slip from Donnelly. This would be well before the April 17 date that Monin acknowledges receiving the request for review.

Also, and significantly, once the search took place on April 15, charges were not assessed against Farid until Simmons' Misbehavior Report dated *April 19.* As Farid observes in his brief, "it is quite possible that Monin and Simmons spoke about the matter prior to the date that Simmons wrote the report. Both of the officers were assigned to B–Block, Monin was Simmons['] superior, and it was Monin that initiated the disciplinary proceedings against the Plaintiff by asking Simmons to conduct an investigation into the matter." Item 65, p. 8. Providing the non-moving party with every favorable inference, it is possible that Monin may have known about the Petition on April 15, before the search of Farid's cell and work area was conducted. In any case, Monin knew about it at some time on April 15, well before the filing of the Misbehavior Report.

Under the circumstances, the Petition may have been a substantial or motivating factor in drafting the charges against Farid, who the officers perceived as a leader in protesting the alleged behavior of officer Rademacher and thus had a motive to single him out for retaliation. In the Misbehavior Report, Simmons describes the Petition as an "unofficial Petition filed against a staff member . . . ." Item 21, Ex. A.

In addition, the gravity of the charges, when compared to the evidence in support,

suggests enough of a disparity to legitimize the claim of retaliation. Farid was charged with and found guilty of improper solicitation, based solely on the fact that he possessed copies of a freely available CFLJ application. The CFLJ was an approved organization, and Attica had authorized a disbursement for Farid's membership dues. Item 31, p. 17; Item 66, ¶ 50. Two inmate witnesses at Farid's Tier III hearing described the ready availability of the membership applications in the law library. Farid was not charged with distributing, but *intent* to distribute. Defendants provide no rule or regulation that an inmate may be disciplined for such an intent.

The making-threats charge related to the articles. However, there is no evidence that Farid ever sought to distribute the articles to other inmates. The Rip article had apparently been submitted to and printed in an outside newspaper prior to this incident. A reasonable reading of the Rip article would cause a reviewer to conclude that it did not incite violence or disruption, and that its intended audience was not even other prisoners. At the Tier III hearing, Pratt, the inmate who attempted to "clear" the article with the package window officer, testified that he voluntarily offered it to the officer for review, saying "go ahead and read—there's nothing there." Item 21, Ex. E, p. 9. Pratt's assessment was that the article contained nothing inflammatory that could be "construed as anything detrimental." *Id.*, p. 10. No evidence indicates that any inmate ever threatened prison security as a result of reading Farid's articles.[9]

The charge of "organizing activities which may be detrimental to the order of the facility" related to the Petition. *Id.* There is no evidence indicating that any inmate ever threatened prison security as a result of signing the Petition which, despite defendants' claims, was a permissible way for prisoners to assert grievances.[10]

Concerning the charge of misusing state property, Farid testified that he had used the law library copy machine for personal copies on many occasions. He understood the rule as being "pay the cost of copying, have it put on the books on what they had—they had a record book for how many copies a particular inmate had in his account, and take it up there to be copied." Item 21, Ex. F, p. 62. He had done that before, and apparently had not been disciplined for doing so.

Although defendants deny that the Petition formed any part of the reason for their conducting the search, the issue of retaliation in this case turns largely on the assessment of the credibility of the primary players, defendants Monin and Simmons, and plaintiff Farid. Such credibility issues are "not readily amenable to resolution on summary judgment." *Colon,* 58 F.3d at 873.

### 3. Would Farid have been Disciplined even in the Absence of Protected Conduct?

 Once Farid carries his initial burden, "the defendants must show by a

---

**9.** It is troubling that inmate Pratt, who admittedly also "possessed" the Rip Article, was not charged with a violation of prison rules. Item 21, Ex. E, p. 10. This evidences that to some extent defendants singled out Farid for adverse treatment.

**10.** The New York State Supreme Court held in *Abdur–Raheem v. Goord,* 244 A.D.2d 937, 665 N.Y.S.2d 152 (2nd Dept.1997), that to find an inmate guilty of violating Rule 104.12, "the inmate must 'lead, organize, participate, or urge other inmates to participate * * * in actions,' and not merely intend to do so." In the case at bar, no evidence exists that Farid *actually* attempted to organize, etc. other inmates to any action detrimental to the order of the facility.

preponderance of the evidence that they would have disciplined the plaintiff 'even in the absence of the protected conduct.'" *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996) (quoting *Mt. Healthy City School Dist. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977)).

Assessing this factor, the court must analyze whether Farid would have been disciplined absent the "improper" motive of retaliation for filing the Petition. In this regard, the court views Farid's act of filing the Petition *in isolation* from the other charges emanating from the alleged smuggling incident of April 15. Defendants insist that the Petition investigation was totally unrelated to the series of events following discovery of the allegedly contraband article. Item 27, ¶¶ 87, 122. Consequently, Farid would not have been disciplined at all as a result of his authorship of the Petition. Defendants cite the content of the Rip article, not the Petition, as setting off the chain of events that resulted in the disciplinary charges. It appears unlikely that Farid would have been charged with or disciplined for solicitation, organizing activities, or misusing state property if not for the actual content of the articles which provoked the spate of charges.

Given this analysis, the court finds that Farid has provided enough evidence to defeat defendants' motion for summary judgment on First Amendment retaliation grounds against defendants Monin and Simmons.

## E. CONTENT AND POSSESSION OF ARTICLES AND OTHER DOCUMENTS

This claim relates to the documents seized from Farid's cell and library work area which were deemed contraband and which were at issue at the Tier III hearing. Item 21, Ex. A. The documents at issue are: the Petition, the Rip Article, the CFLJ application, and the Three–Fifths Article.

Even though a prisoner is incarcerated, he or she retains First Amendment rights, within limits. "Although inmates retain some of their constitutional rights during incarceration, the Supreme Court has stated that '[t]he fact of confinement and the needs of the penal institution impose limitations on constitutional rights, including those derived from the First Amendment, which are implicit in incarceration.'" *Leitzsey v. Coombe,* 998 F.Supp. 282, 286 (W.D.N.Y., 1998) (quoting *Jones v. North Carolina Prisoners' Union,* 433 U.S. 119, 125, 97 S.Ct. 2532, 53 L.Ed.2d 629 (1977)). In cases raising First Amendment concerns, the courts must be particularly vigilant about content-based censorship. The Second Circuit, in *Abdul Wali v. Coughlin,* 754 F.2d 1015 (2nd Cir.1985), *rev'd on other grounds, O'Lone v. Estate of Shabazz,* 482 U.S. 342, 350 n. 2, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987), described the court's role as balancing deference to the expertise of prison guards and administrators in making decisions about the potential for unrest as they enforce regulations, with their duty to insure that the "precious constitutional rights" of inmates are not being abridged. *Id.* at 1018.

Most prison-related First Amendment cases concern inmates' challenges to prison regulations which they argue impinge upon their rights. *See, e.g., Thornburgh v. Abbott,* 490 U.S. 401, 109 S.Ct. 1874, 104 L.Ed.2d 459 (1989); *Turner v. Safley,* 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987). Many cases, like *Abdul Wali* for example, concern regulations governing the content of material coming *into* the prison.

Although *Abdul Wali* concerned an inmate's right to receive publications, it provides guidance concerning how content-

based determinations are made in a prison setting. The court looked first at DOCS Directive 4572, which provides guidelines for receipt and review of literature, and requires the establishment of "facility media review committees" in prison facilities. Those committees are charged with determining what materials may be denied to inmates based on content. *Id.* at 1024. The decision in *Abdul Wali* was made at the highest level of judicial review, while in this case it was made at the very lowest level of review by two correction officers who, under the regulations, had no authority to make such a review.

DOCS Directive 4572, provides in pertinent part:

I. POLICY. It is Departmental policy to encourage inmates to read publications from varied sources if such material does not encourage them to engage in behavior that might be disruptive to orderly facility operations. Accordingly, inmates shall be allowed to subscribe to and possess a wide range of printed matter such as books, magazines and newspapers, subject to the provisions of this directive, because these items may promote constructive individual development.

In the event that the Superintendent, or his designee, believes that printed material addressed to an inmate represents a possible threat to orderly facility operations, that material will be referred to the Facility Media Review Committee (FMRC) for its assessment and disposition.

II. STANDARDS....

. . . . .

C. The publication should not incite violence based on race, religion, sex, sexual orientation, creed, or nationality. "Incite violence," for purposes of this guideline, means to advocate, expressly or by clear implication, acts of violence.

. . . . .

H. ...

Publications which discuss different political philosophies and those dealing with criticism of Governmental and Departmental authority are acceptable as reading material provided they do not violate the above guidelines. For Example, publications such as ... *The Militant,* ... and *Revolutionary Worker* shall generally be approved unless matter in a specific issue is found to violate the above guidelines.

III. PROCEDURE. In view of the above considerations, the Department specifies the following procedures for the evaluation and approval or disapproval of literature for inmates.

. . . . .

B. ...

When there is a good faith belief that a publication already belonging to or in possession of an inmate violates one or more of the media review guidelines, said publication shall be confiscated and referred to the FMRC for review and decision.

C. ...

The FMRC shall meet at least once weekly unless there are no publications for review.

Directive 4572 also provides for various methods of appeal if a publication has been disapproved by the FMRC.

The importance the *Abdul Wali* court placed on compliance with DOCS Directive 4572 is clear:

The DOCS guidelines provide corrections officials great leeway in determining what literature is permitted into prison facilities, yet assure that each decision represents the consensus of a

number of penological professionals, rather than the bias or animosity of a particular official.... Where a corrections official chooses to ignore established standards and procedures, however, he must be prepared to demonstrate that his decision—reached in consultation with no one, and made in reliance on no more than his personal beliefs—is supported by reasonable justification.

*Id.* at 1036.

 In this case, no attempt was made by defendants to comply with Directive 4572 by referring any of the documents to the committee in spite of the fact that defendant Simmons noted the existence of a "media review committee" at Attica. Item 61, Ex. C, p. 28. The committee was not consulted about any of the documents determined to be contraband, and there is no explanation why this was not done. Rather, the documents were evaluated for content by defendants Monin and Simmons, and then by James. Further, none of them made an effort to comply with the instruction given in *Abdul Wali* that where a corrections officer chooses to ignore established standards or procedures, he must be prepared to demonstrate that his decision is supported by reasonable justification. This failure to comply with procedures is sufficient to deny defendants' motion for summary judgment. However, in addition, when considering the content of the documents at issue, the court is convinced that defendants fail to make the requisite showing on their motion for summary judgment that Farid's First Amendment claims should be dismissed. Specifically:

### a. *The Petition*

The Petition was prepared by Farid and sent directly to the Superintendent of Attica. The Superintendent forwarded it down the chain of command for investigation. Thus, prison officials at the highest levels knew that Farid had prepared the Petition and should logically have assumed that he retained a copy of it. At no time did any high-ranking prison official treat the Petition as either "unauthorized" or as contraband. Yet, Simmons, Monin, and James, on their own, concluded that the Petition was "unauthorized" and contraband. They came to this conclusion even though Monin's report, which investigated the complaint made via the Petition, dated April 23, 1996, did not opine that the Petition was unauthorized or contraband. Item 25, Ex. B.

Almost as an afterthought, defendants assert that Farid was preempted by the prison grievance system from bringing his complaint by petition. Item 22, ¶¶ 16—21. Defendants did not assert that argument at any time from the first receipt of the Petition by Kelly through Monin's report of the Petition's allegations. If that is in fact to be considered in support of defendants' finding the Petition "unauthorized" and contraband, it is curious that no other signatory to the Petition was charged with violation of prison codes. This underscores Farid's claim that he was retaliated against by being singled out for discipline.

### b. *The Rip Article and the Three–Fifths Article*

Defendants advance no evidence that either article actually inspired or provoked any inmate to any behavior, volatile or otherwise. No evidence linked the newspaper publication of the Rip Article to any prison unrest or showed that Farid intended to provoke unrest. Most decisive, the articles are quite benign and obviously satirical. They are thoughtful, well-written political and social commentaries that use

historical allusions to make their point.[11] Simply because the Rip article contains the words "mass mobilization" does not mean that it can reasonably be interpreted as Farid's issuing a call for mass mobilization of prisoners.

The Three–Fifths article draws parallels between the Military Industrial Complex of yesteryear and the Prison Industrial Complex of today.[12] This article, as well, cannot be reasonably interpreted as calling for any kind of inmate action "which may be detrimental to the order of the facility," in violation of Regulation 104.12.

### c. *Center for Law and Justice Application*

Farid claims that copies of the application were available on the counter in the Law Library. That is corroborated by testimony of two other inmates, Tindell and James, at Farid's Tier III hearing. Item 21, Ex. E, p. 15; *id.*, p. 16.

Again, there is a troubling disparity between the way Farid was treated and the way other inmates were treated. Tindell admitted that he had written the CFLJ and had received materials from them. Farid had seen him reading the material and asked him for an application. *Id.*, p. 15. Yet, Tindell was not charged with any violation of regulations prohibiting solicita-

tion of other inmates, misuse of the copier, or possession of contraband. Farid testified that he whited-out the information on a copy of the form he possessed so that he could distribute the form to other inmates who might wish to join the CFLJ. *Id.*, p. 13.

Captain James found that the application "clearly solicits money" due to the application fee required. *Id.*, p. 20. Payment of Farid's yearly dues was approved by the Attica administration. Item 66, ¶ 46. Therefore, it may be assumed, at least for purposes of this motion, that the organization is an "authorized" organization. Any funds required for membership were solely payable to the organization and not to Farid. It is a stretch to treat intended, but unaccomplished, circulation of a document concerning an authorized organization, calling for no remuneration to Farid, as a solicitation of other inmates.

Mindful of the latitude to be accorded prison officials to exercise discretion in matters potentially affecting the safety and order of the prison environment, the court must pay special attention to First Amendment matters. In this case, defendants' broad discretion is not impinged, since on the present record there is no reasonable basis to find that the seized documents

---

**11.** The Rip article comments, from a prisoner's point of view, on how prison conditions have worsened over the years. Among the "inflammatory" statements cited by defendants, which provoked the searches and disciplinary charges, are the statements, "Mass prisoner mobilization coupled with the Civil Rights movement was the principal cause of prisoner reforms in the early 1970s." Evidently this was an historical reference. Item 66, Ex. E, p. 2. Farid points to the massive prison-building campaign promoted by former Governor Cuomo as bringing in its wake a lessening of prisoner's rights. He then comments how the pendulum has now swung back to pre–1970 conditions and provides examples of difficulties experienced by prison-

ers. The article ends by musing that Gov. Pataki's policies could be a blessing in disguise: "If Pataki's vicious onslaught doesn't provide the catalyst for mass prisoner mobilization, then what else could? One thing for sure, Rip has been given the wake-up call." *Id.*, p. 4. That statement is a commentary that Pataki's policies may provoke prisoner reaction, not urging that action follow.

**12.** It refers to current inequalities between white and black Americans, and posits that the "War on Crime" is "a shabbily disguised way of declaring war on African descendants and other people of color in the United States." Item 66, Ex. F, p. 4.

posed a threat to the safety and good order of Attica. On the present record, neither the content of the documents, nor the context in which they were allegedly recovered, represents advocacy of violent prison unrest.

The court finds that there is a genuine question of material fact as to whether defendants Simmons, Monin, and James' views of the articles as constituting threats, and the Petition as an unauthorized document that urged other inmates to participate in actions detrimental to the order of the facility, were reasonable. For the reasons set forth above, the court denies defendants' motion for summary judgment on the issue of First Amendment violations based on Farid's authorship and possession of the articles and their content.

## F. DUE PROCESS

Farid asserts that defendant James, the Tier III hearing officer, was not impartial, refused to let him call witnesses, and refused to entertain some of his objections in violation of his due process rights. Specifically: (a) James refused to hear argument why he should recuse himself as hearing officer (Item 21, Ex. E, p. 3); (b) James refused to hear argument that the proceeding was untimely (*id.*); (c) James denied Farid's request to call Lt. Bradt and officer Petito as witnesses (*id.* at 19); and (d) James accepted without question the chronology of events set forth in the misbehavior report, *i.e.*, that Monin and Simmons first learned of the Petition after conducting the cell and library searches. *Id.*

Farid argues that James simply accepted the recitation of facts in the misbehavior report, and James rejected his claim that no copy of the Petition was in his cell and that the only copies were found in his library work area. *Id. See also* copies of Forms 2176, Item 21, Ex. F.

Due process requires that prison disciplinary hearings be impartial. *Russell v. Selsky*, 35 F.3d 55, 59 (2d Cir. 1994); *Colon*, 58 F.3d at 871. However, the level of impartiality required of prison officials conducting disciplinary proceedings does not rise to the level of impartiality required of judges generally. *Francis v. Coughlin*, 891 F.2d 43, 46 (2d Cir.1989). Even so, an inmate must be given "an opportunity, when consistent with institutional safety and correctional goals, to call witnesses and present documentary evidence in his defense ...." *Walpole v. Hill*, 472 U.S. 445, 454, 105 S.Ct. 2768, 86 L.Ed.2d 356 (1985). An impartial hearing officer "is one who, *inter alia*, does not prejudge the evidence and who cannot say ... how he would assess evidence he has not yet seen." *Patterson v. Coughlin*, 905 F.2d 564, 570 (2d Cir.1990).

Here, James denied Farid's request to call witnesses (Bradt and Petito), whose testimony Farid considered as critical to the merits of his defense that the Petition could not have been found in his cell and that the charges were filed in retaliation for his leadership role in authoring and filing the Petition. Calling the officers would not have implicated any safety concerns. A similar refusal by a hearing officer to hear testimony challenging the corrections officer's rendition of facts in a misbehavior report was held to deprive an inmate of a full and fair opportunity to litigate his claims. *Colon*, 58 F.3d at 871. Farid also alleges that James harbored a pre-existing bias against Muslim inmates, claiming that James intentionally positioned himself as hearing officer for disciplinary hearings involving Muslim inmates. Item 61, Ex. F, p. 68; Item 66, ¶ 29. For that reason, Farid sought James' recusal as hearing officer. James denies any bias.

The court finds that there is an issue of fact as to whether James's refusal to consider the merits of Farid's principal defense to the charges against him was objectively reasonable, and whether James's decisions violated Farid's federally protected due process rights. *See Colon*, 58 F.3d at 871. Summary judgment in favor of James on this claim is not appropriate.

All parties agree that Farid succeeded in obtaining reversal of the Tier III judgment through an Article 78 proceeding in state court. Although the Article 78 court based its holding on the fact that the hearing was untimely under the regulations, a procedural defect sufficient to warrant reversal and expungement, it also commented on James's denial of allowing correctional officers to be questioned by Farid. Item 72. While this decision has no *res judicata* effect, it serves as persuasive authority that Farid's due process rights were violated.

## G. QUALIFIED IMMUNITY

Defendants argue that, as a matter of law, nothing they did rises to the level of a constitutional violation. In the alternative, defendants allege that even if some of their acts rise to the level of a constitutional violation, they are entitled to qualified immunity for such conduct because they acted in the good faith belief that their conduct was proper.

 Qualified immunity does not bar declaratory and injunctive relief. *Allen v. Coughlin*, 64 F.3d 77, 81 (2d Cir.1995). Even if qualified immunity were established in this case, it would not provide grounds for dismissal of all of Farid's claims. *Id.* at 81. It is a defense which defendants must plead and prove. *Duamutef v. J.M. Moran, et. al*, 1998 WL 166838 at *1 (N.D.N.Y.1998), *citing Gomez v. Toledo*, 446 U.S. 635, 640, 100 S.Ct. 1920, 64 L.Ed.2d 572 (1980).

 A public official is not immune from damages under 42 U.S.C. § 1983 if he "knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights" of the plaintiff. *O'Connor v. Donaldson*, 422 U.S. 563, 577, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1975) (quoting *Wood v. Strickland*, 420 U.S. 308, 322, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975)). This rule applies to prison officials. *Procunier v. Navarette*, 434 U.S. 555, 562, 98 S.Ct. 855, 55 L.Ed.2d 24 (1978).

 The inquiry must be directed to the "objective reasonableness" of the official's acts. The official will be held liable when his or her conduct "violate[s] clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). Whether the law on a particular issue was clearly established is a question of law to be determined by the court. *Stein v. Bd. of Educ. City of New York*, 792 F.2d 13, 18 (2d Cir.1986). The district court looks to case law decided by the Supreme Court and decisions of the circuit court of appeals under which it operates. While courts are urged to resolve issues of qualified immunity at the earliest possible stage in 42 U.S.C. § 1983 litigation, where a factual question material to the issue exists (such as the reasonableness of the officers' actions), the issue cannot be resolved on a motion for summary judgment. *Kerman v. City of New York*, 261 F.3d 229, 240 (2d Cir.2001) ("[S]ummary judgment on qualified immunity grounds is not appropriate when there are facts in dispute that are material to a determination of reasonableness." (Citation omitted)). "In other words, if any reasonable trier of fact could find that the defendants' actions were objectively unrea-

sonable, then the defendants are not entitled to summary judgment" on qualified immunity grounds. *Minigan v. Irvin,* 977 F.Supp. 607, 611 (W.D.N.Y.1997), citing *Robison v. Via,* 821 F.2d 913, 921 (2d Cir.1987).

### 1. Retaliation

■ A prisoner's right against retaliation for engaging in protected First Amendment activities, such as petitioning the government for redress of grievances, has been clearly established since at least 1988, in this circuit with *Franco v. Kelly,* 854 F.2d at 589–90 (citing Supreme Court precedent, *United Mine Workers v. Illinois State Bar Ass'n,* 389 U.S. 217, 222, 88 S.Ct. 353, 19 L.Ed.2d 426 (1967)). *See Richardson v. Coughlin,* 763 F.Supp. 1228 (S.D.N.Y.1991). The court finds that defendants Monin and Simmons would have been aware of such existing law; and thus, qualified immunity does not provide them with a defense on the First Amendment retaliation claim.

### 2. First Amendment Violations

■ Over twenty-five years ago, the Supreme Court wrote, "There is no iron curtain drawn between the Constitution and the prisons of this country." *Wolff v. McDonnell,* 418 U.S. 539, 555–56, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). The next year, the Second Circuit opined, "First Amendment rights to hold and express beliefs and receive information are entitled to 'special solicitude.'" *Morgan v. LaVallee,* 526 F.2d 221, 224 (2d Cir.1975) (citations omitted). *See, e.g., Turner v. Safley,* 482 U.S. 78, 83–84, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987) citing *Procunier v. Martinez,* 416 U.S. 396, 405–06, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974). This right is so deeply ingrained that prison regulations start with that axiom of American Democracy as a point of reference, and then proceed to limit the right when a writing is considered threatening and thus detrimental to prison security. In other words, prison inmates retain "those First Amendment rights that are not inconsistent with ... status as a prisoner or with the legitimate penological objectives of the corrections system." *Giano v. Senkowski,* 54 F.3d 1050, 1053 (2d Cir.1995) (citation omitted). The defendants have pointed to the security and order of the prison population as being the penological interest threatened by the content of the articles and Petition. Consequently, the test which this court must apply is whether there is "substantial evidence in the record to indicate that the officials have exaggerated their response ...." *Pell v. Procunier,* 417 U.S. 817, 827, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974).

In this latter regard, New York Corrections Law § 138 provides: "Inmates shall not be disciplined for making written or oral statements, demands, or requests involving a change of institutional conditions, policies, rules, regulations, or laws affecting an institution." N.Y. Correct. Law § 138(4) (McKinney's 1987). As the discussion, *supra,* indicates, it is certainly a reasonable conclusion both that Farid's speech was compatible with New York's penological objectives, and that the officials' response was exaggerated. *See Salahuddin v. Harris,* 657 F.Supp. 369, 376–78 (S.D.N.Y.1987).

It is also objectively reasonable that defendants Simmons, Monin, and James would have been aware of Farid's First Amendment rights. In addition, because the court has found that there is a genuine question of material fact as to whether defendants Simmons's, Monin's, and James's views of the articles as inflammatory and containing threats were *objectively* reasonable, qualified immunity is unavailing to defendants on this claim.

### 3. Due Process

The basic standards regarding a prisoner's right to call witnesses and present evidence at a disciplinary hearing were articulated in *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). See also *Russell v. Selsky,* 35 F.3d 55 (2d Cir.1994). An inmate subject to a disciplinary hearing is entitled to an impartial hearing officer. *Wolff,* 418 U.S. at 570–71, 94 S.Ct. 2963; *Russell,* 35 F.3d at 59. It is objectively reasonable that defendant James would have been aware of such precedent. Thus, there are genuine issues of material fact as to whether James was reasonable in (a) deciding the correctional officer witnesses Farid sought were irrelevant and redundant, (b) refusing to entertain his procedural objections, and (c) refusing to recuse himself. Therefore, qualified immunity does not provide him a defense on this ground.

### V. CONCLUSION

Based on the foregoing, defendants' motion for summary judgment as to defendants Goord, Kelly, and Selsky is granted. Defendant's motion for summary judgment as to defendant James is granted on the retaliation claim, but denied on the First Amendment and Due Process claims; and the motion for summary judgment of defendants Monin and Simmons is granted on the due process claim and denied on the retaliation and first amendment claims.

The court will meet with counsel on Wednesday, April 24, 2002, at 10 a.m.

So ordered.